BALTIMORE & OHIO RAILROAD COMPANY *v.* UNITED STATES EX REL. PITCAIRN COAL COMPANY.

ERROR TO THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 289.   Argued October 18, 19, 1909.—Decided January 10, 1910.

Regulations which are primarily within the competency of the Interstate Commerce Commission are not subject to judicial supervision or enforcement until that body has been properly afforded an opportunity to exert its administrative functions. *Texas & Pacific Railway Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, applied, and *Southern Railway Co.* v. *Tift*, 206 U. S. 428, distinguished.

The distribution to shippers of coal cars including those owned by the shippers and those used by the carrier for its own fuel is a matter involving preference and discrimination and within the competency of the Interstate Commerce Commission, and the courts cannot interfere with regulations in regard to such distribution until after action thereon by the commission.

Even if not assigned as error, this court will consider the jurisdictional question of whether there is power in the court, in view of the provisions of the act to regulate commerce, to grant the relief prayed for in regard to matters within the competency of the Interstate Commerce Commission.

Under the court review provisions of § 15 of the act to regulate commerce as amended in 1906, the courts are limited to the question of power of the commission to make the order and cannot consider the wisdom or expediency of the order itself. *Interstate Commerce Commission* v. *Illinois Central Railroad, ante*, p. 452.

Section 23 of the act to regulate commerce, although added thereto in 1889, will now be construed in the light of § 15, as amended in 1906; and the remedy of mandamus is limited to compelling the performance of duties which are either so plain as not to require a prerequisite exertion of power by the Interstate Commerce Commission, or which plainly arise from the obligatory force given by the statute to existing orders rendered by the commission within the lawful scope of its authority

Petition in mandamus by a shipper averring discrimination in distribution of coal cars by the Baltimore and Ohio Railroad dismissed because the matter had not been first submitted to the Interstate Commerce Commission.

165 Fed. Rep. 113, reversed.

THE facts are stated in the opinion.

*Mr. Hugh L. Bond,* with whom *Mr. W. Ainsworth Parker* was on the brief, for Baltimore and Ohio Railroad Company, plaintiff in error.

*Mr. Edgar H. Gans,* with whom *Mr. Charles H. Markell* was on the brief for Fairmont Coal Company *et al.,* plaintiffs in error.

*Mr. William A. Glasgow, Jr.,* with whom *Mr. Frederick Dallam* was on the brief, for defendants in error.

MR. JUSTICE WHITE delivered the opinion of the court.

To decide the merits of this cause will require us to determine the legality of the regulations of the Baltimore and Ohio Railroad Company, by which that company distributed cars to coal mines along the line of its road in case of car shortage. As an incident to this general question we would further be required to consider the relations, irrespective of its mere attributes and duties as a common carrier, of the Baltimore and Ohio Railroad with various coal mines along the line of its road and the relation with or control over some, if not all, of these coal mines by other mines or mine operators, and in

addition to consider the relation of the Baltimore and Ohio Railroad with the Cumberland and Pennsylvania Railroad. This road taps the main track of the Baltimore and Ohio railroad at Cumberland, Maryland, proceeds thence to the state line between Maryland and Pennsylvania, where it strikes the Pennsylvania Railroad, and passing thence through a country rich in bituminous coal deposits, and containing coal mines, it reaches Piedmont, West Virginia, where its tracks again connect with those of the Baltimore and Ohio Railroad. As an additional incident we might also be required to consider the relation or control, direct or indirect, if any, which the Baltimore and Ohio Railroad exerted over some, if not all, of the coal mines along the line of the Cumberland and Pennsylvania road. Some, therefore, of the underlying questions involved in the cause, if we may consider them, are similar to the issues which were passed upon by us in the case of the *Interstate Commerce Commission* v. *Illinois Central Railroad,* which we have just decided, *ante,* p. 452. While referring to the general situation as depicted in that case, we think, in addition, a mere outline sketch of the conditions existing prior to the commencement of this suit, as regards the matters with which it is concerned, will serve to render clear the reasons which control us in deciding it,

The Baltimore and Ohio Railroad Company, a corporation existing under the laws of Maryland, owned and operated a railroad or railroads in the States of Maryland, West Virginia, Virginia, Pennsylvania, Ohio and other States, and, as a common carrier, was engaged in interstate commerce between such States. The main line of said road west of Cumberland, Maryland, passes through a bituminous coal field, which is worked by many coal operators, the product of whose mines depend for their movement to market in interstate commerce on the facilities for such movement which the Baltimore and Ohio affords. For the purpose of this case, the coal mines referred to may be treated as situated in what is described as the Monongah District of the Baltimore and Ohio Railroad.

Regulations of the Baltimore and Ohio Railroad, by which mines were rated in order to fix the basis for a *pro rata* distribution of coal cars in case of car shortage, had their peculiarities differing from other roads. They were based, first, upon the capacity of the mines; second, upon the previous shipments by the mines for a period of two years, the capacity counting as one and the previous shipments as two. The capacity was ascertained by considering the number of working places, etc., modified by taking into account the facilities for moving the coal out of the mine, such as tracks, tipple, etc. The previous shipments were taken from the records of the company during periods when there was no car shortage. Upon the basis of the capacity thus ascertained the regulations of the company for giving each mine owner in the case of shortage its percentage of cars, stated in the most summary way, were briefly these: In the first place, there was assigned, out of the general mass of cars before the distribution was made, such cars as it was deemed the Cumberland and Pennsylvania Railroad was entitled to. This was done by no fixed rule, but, in the discretion of the traffic manager, generally upon the basis of the percentage of shipments of coal hauled in the two previous years by that road. The estimated mass remaining after the deliveries to the Cumberland and Pennsylvania Railroad were subjected to certain arbitrary assignments, and the remainder, after such assignments had been taken out, were equally distributed among the mine operators, according to their capacity rating. The arbitrary deductions which were made, as we have just stated, were these:

1. Baltimore and Ohio Railroad cars placed at mines for Baltimore and Ohio fuel coal.

2. New mines are allotted an arbitrary number of cars daily or weekly for development. In cases where the inspection shows a marked increase in the capacity of certain mines, and it is not practicable to change the percentage of the whole district, proper arbitraries are applied pending a general revision.

3. Cars of foreign railroads assigned by them to their own fuel trade.

4. Cars of individual companies placed at mines owned by such companies and cars owned by individual consumers placed at mines for their coal.

There are also certain exceptions of a local character, as follows:

1. Curtis Bay premium. Whenever a shipper on the Baltimore and Ohio Railroad handles cars at Curtis Bay promptly in any one month, he is allowed in the succeeding month a premium of fifty per cent of the number of cars so handled, in addition to his regular percentage. This in lieu of an assignment of cars to the Curtis Bay trade.

2. At certain points, noted on the percentage sheets, an arbitrary number of cars is assigned to mines on fire.

3. At certain mines in the immediate vicinity of industries, empty cars intended for loading at such industries are first sent into the mines for loading coal for such industries.

4. When annual contracts are placed for foreign railroad fuel coal with mines on the Baltimore and Ohio, arrangements are made that if the foreign railroads' cars are furnished for this fuel coal, the Baltimore and Ohio will allow the mines shipping the coal a number of Baltimore and Ohio cars equal to the foreign cars furnished.

5. When mines are connected with foreign railroads as well as with the Baltimore and Ohio, their rating is reduced fifty per cent. A similar reduction is made in cases where mines are located near rivers and are equipped for loading boats.

Where mines needed box and stock cars for the shipment of coal, as to which class of cars shortage rarely arose, there was a special rule which we need not notice.

With the system just referred to in force on the nineteenth of January, 1907, the Pitcairn Coal Company, a West Virginia corporation, owning a coal mine on the line of the Baltimore and Ohio Railroad in West Virginia, filed its petition in mandamus in the United States Circuit Court for the District of

Maryland. The defendants were the Baltimore and Ohio Railroad Company, the Fairmont Coal Company, the Clarksburg Fuel Company, the Pittsburg and Fairmont Fuel Company and the Southern Coal and Transportation Company, these four coal companies operating coal mines located in West Virginia on the Monongah Division of the Baltimore and Ohio Railroad. Along with these there were also made defendants two other corporations, the Consolidation Coal Company, located on the Cumberland and Pennsylvania Railroad in Maryland, and the Somerset Coal Company, located on the Baltimore and Ohio Railroad in Pennsylvania. All of these coal companies were charged to be substantially one in interest and were generally described as the Fairmont Companies. In addition, thirty-one other coal companies, alleged to be independent companies, operating coal mines on the line of the Baltimore and Ohio Railroad, were also made defendants. Rearranging somewhat the order of the averments as contained in the bill, the prayer for relief was substantially based upon the following grounds: The Pitcairn Coal Company, it was averred, was entitled to an equal distribution of the coal cars of the Baltimore and Ohio Railroad in times of shortage, in order to move its output of coal in interstate commerce, that the railroad company had refused, after demand, to give it the share of cars to which it was entitled, and that its not doing so had been seriously prejudicial to the business of the company, had curtailed its production and interfered with the moving of the coal produced in interstate commerce, and that the conduct of the railroad in the premises had amounted to the giving of an undue preference to the Fairmont Coal Company and its affiliated companies, to the prejudice of the Pitcairn Company and all other independent companies. The method pursued by the Baltimore and Ohio Railroad for rating mines, by the consideration of both capacity and previous shipments, was alleged, and it was charged that, on the basis of capacity of the mine as rated by that system, the Pitcairn Company was entitled to seven-tenths per cent.

of the cars for distribution in the Monongah Division. General averments were, however, made concerning the method of rating, which, in effect, charged that such method was discriminatory and preferential, and was put in force so as to operate in favor of the Fairmont Coal Company and the companies affiliated with it, to the prejudice of the Pitcairn Company and other independent coal operators, the Baltimore and Ohio Railroad being interested, it was charged, directly or indirectly, in the Fairmont and its affiliated companies. The method of deduction from the mass of cars for the benefit of the Cumberland and Pennsylvania Railroad was also charged to be discriminatory and preferential, and to have been devised for the purpose of favoring mines on the line of the Cumberland and Pennsylvania, which were affiliated with the Fairmont. The failure to charge against the mines which had received them, individual or private cars, foreign railroad cars and company fuel cars, as well as the other arbitrary allotments of cars provided for in the regulations to which we have referred, including the Curtis Bay regulation, were all assailed as preferential and discriminatory, it being alleged that in many instances the individual cars had been virtually paid for by the Baltimore and Ohio Railroad, and that the failure to charge them was in effect a mere means resorted to in order to give a preference contrary to the act to regulate commerce. The prayer was for an alternative writ of mandamus, commanding an equal distribution in accordance with the averments of the petition in effect for the undoing of the regulations referred to, and for the establishment of regulations conformable to the rights which the petition asserted. As the scope of the prayer is important in the view we take of the case, it is excerpted in the margin.[1]

[1] First. That in the event of scarcity of cars to be furnished by defendant, Baltimore and Ohio Railroad Company, to shippers of coal on the Monongah Division of said road, that defendant, the Baltimore and Ohio Railroad Company, be required to furnish to relator one and seven-tenths (1.7) per cent until such percentage shall properly

It suffices for the present purposes to say that the answer of the Baltimore and Ohio Railroad traversed every averment as to preference and discrimination, asserted the validity of the method of rating and the rules of distribution to which we have referred. In great detail the origin and history of the operation of private or individual cars was set out, various contracts on that subject were annexed to the bill, and a decree rendered by the Circuit Court of the United States for the Northern District of West Virginia in favor of the Fairmont Coal Company, perpetually enjoining the Baltimore and Ohio Railroad Company to deliver certain private cars to the Fair-

be increased, of the total number of cars in service, or supplied to all the shippers on the Monongah Division of said road, without deducting from said number of cars "Individual Cars," or any arbitrary allotment of cars to other shippers, and without deducting from the total number of cars on all the lines of the Baltimore and Ohio Railroad the "Individual Cars" claimed by the Somerset Coal Company, or the cars arbitrarily assigned to the Cumberland and Pennsylvania Railroad Company, or the Consolidation Coal Company, before making the percentage distribution to the Monongah Division.

Second. That writ of mandamus may be issued against the said Baltimore and Ohio Railroad Company, defendant, to command and require it to cease to make or give any undue, or unreasonable preference or advantage to Fairmont Coal Company, Consolidation Coal Company, Cumberland and Pennsylvania Railroad Company, Somerset Coal Company, Southern Coal and Transportation Company, Clarksburg Fuel Company, or Pittsburg and Fairmont Fuel Company, or either of them, in the shipping and transportation of their coal, and to cease from subjecting the relator, Pitcairn Coal Company, or any other independent shipper of coal on the Monongah Division aforesaid, to any undue or unreasonable prejudice or disadvantage in the shipping and transportation of coal, or in any respect whatsoever and to move and transport the traffic of relator, Pitcairn Coal Company, and the other independent coal companies on the Monongah Division aforesaid, without discrimination or preference, and to furnish the said Pitcairn Coal Company, and the other independent shippers of coal on the Monongah Division, without preference or discrimination, and upon conditions as favorable to it or them as is given by the said railroad company to the said Fairmont Coal Company, Consolidation Coal Company, Somerset Coal Company, Clarksburg

mont Company, was referred to and made part of the bill. The Cumberland and Pennsylvania Railroad Company, the Fairmont Coal Company and the five coal companies alleged in the bill to be affiliated with the Fairmont Coal Company applied for leave to answer, on the ground that, although the alternative rule for mandamus had not been served upon them, and they had only been summoned to "do whatever they deemed proper to protect their interest in the premises," they desired to answer, because the questions involved "are extremely important and of unusual interest, not only to your petitioners and the railroad against whom the mandamus is

---

Fuel Company, Southern Coal and Transportation Company, and Pittsburg and Fairmont Fuel Company, or for like traffic, under similar conditions, to any other shipper, its fair and reasonable percentage of all cars on the line of said railroad and to shippers of like traffic along its railroad line, based upon the system of distribution of cars in effect on said railroad as aforesaid, or upon any fair, reasonable and equitable basis, and to furnish to the said Pitcairn Coal Company, for the transportation of its coal, without discrimination, exception or limitation, and upon conditions as favorable as those given to other shippers, the percentage of the total car supply on said railroad at this time properly distributable by said railroad company to the said Monongah Division, and thereon distributed among the relator and the other shippers of coal thereon as aforesaid.

Third. That in ascertaining and fixing the number of cars to which relator, Pitcairn Coal Company, and the other coal companies on the Monongah Division aforesaid are entitled, the said Baltimore and Ohio Railroad Company shall take into consideration and include in the estimate or calculation of the number of cars, to be divided in the proportion to which the percentages of each mine entitles the owner thereof to cars, all cars, whether owned by individual operators, shippers, other railroad companies or by the Baltimore and Ohio Railroad Company, and which may be upon the road of said Baltimore and Ohio Railroad Company, and shall also take into consideration, and include in the estimate or calculation of the number of cars to be divided upon the percentages aforesaid, all cars, whether furnished or used by for fuel or supply coal for the Baltimore and Ohio Railroad Company, or for any other railroad company, and shall not deduct, before dividing the cars upon the percentages aforesaid, any cars for premiums at Curtis Bay, or other arbitrary allotments.

asked, but to the whole body of transportation companies engaged in interstate commerce, and that the importance of the questions involved is so great that your petitioners feel that they are making but a reasonable request when they ask for a reasonable time to thoroughly present the facts which the court ought to be in possession of for a full and complete determination of the question." The right to answer having been given, and delay for that purpose having been accorded, these companies answered. Without at all going into detail, we think it suffices to say that the answer traversed all the averments as to preference and discrimination alleged in the bill. It specially asserted the legality of the operation on the Baltimore and Ohio Railroad of private or individual cars; made copious reference to the acts or contracts from which the right to operate said cars had arisen; charged that to take said cars from the service of the persons who owned them would be confiscatory, and in substance asserted the validity of the system of rating and of distribution enforced by the regulations of the company which we have previously referred to. Fourteen out of the thirty-one corporations referred to in the petition as independent companies briefly answered, adopting the averments of the petition, and praying for the awarding of the relief therein asked. Sixteen did not answer, and one of said companies substantially joined in the defenses of the railroad company, except as to the individual cars, concerning which it averred that it was the duty of the railroad to purchase said cars from the persons owning them and to operate them as part of the railroad equipment. By stipulation the cause was heard by the court without a jury.

There was voluminous testimony and a protracted trial, each side requesting findings and instructions embodying their respective contentions and excepting in so far as they were overruled. The court considered all the contentions raised by the pleadings except several which were not pressed at bar. It held that in view of the relations which the Cumberland and Pennsylvania Railroad had to the Baltimore and Ohio and

the origin of those relations the method by which coal cars were turned over to the Cumberland road was not preferential or discriminatory. It decided that however amenable, abstractly considered, to criticism, if at all, might be the system of rating, and especially the inclusion therein of the amount of coal shipments, and the large influence attributed to that fact, yet, when the particular facts concerning the Monongah district and the relations of the Baltimore and Ohio to that district were given their proper weight, the system was a just one and ought not to be interfered with. The complaint as to the Curtis Bay premium was also decided to be without merit; and so also was the complaint as to consumer's cars, as to foreign railway fuel cars and company fuel cars. Considering the private cars belonging to mine operators, and, without at all going into the relation of the Baltimore and Ohio Railroad with the owners of such cars, it was decided that while there was a right on the part of the railroad to move the cars, and it would be confiscation to deprive the owners of the right to use them, yet the duty was on the railroad to take account of the cars in fixing the percentage in case of shortage. The court declined to consider the decree which had been rendered in favor of the Fairmont Company against the Baltimore and Ohio in the previous case, which was pleaded, as well as that in another cause which was relied upon in argument to the same effect as controlling. The mandamus prayed therefore was refused as to every item embraced in the petition but that particular item, and, as to it, the writ was awarded. *United States* v. *Balt. & Ohio R. R.*, 154 Fed. Rep. 108.

The Baltimore and Ohio Railroad Company, the Fairmont Companies and the Pitcairn Coal Company prosecuted error. The Circuit Court of Appeals held as follows: *a*, that the system of rating, so far as taking into view the shipments and percentages based thereon was considered, was discriminatory and preferential; *b*, that while the right to allot cars to the Cumberland and Pennsylvania Railroad under the facts found below was lawful, the methods by which the allotment

was made was also discriminatory and preferential; *c*, that the practice as to the Curtis Bay regulation was also amenable to the same criticism; *d*, that the duty existed to take into account the individual cars, the foreign railway fuel cars and the company fuel cars in making a *pro rata* division in case of car shortage, and that not to do so would give rise to undue preferences and unlawful discriminations forbidden by the act to regulate commerce. Concluding that the various subjects embraced in the complaint with which it thus dealt were all controlled by the act to regulate commerce, it was expressly decided that the right to rectify the wrongs by the issue of the writ of mandamus as prayed for was sanctioned by the twenty-third section of the act to regulate commerce, and the case was remanded to the court below, with directions to allow the writ of peremptory mandamus, in accordance with the opinion. *United States* v. *Balt: & Ohio R. Co.*, 165 Fed. Rep. 113. The case is here upon error prosecuted by the Baltimore and Ohio Railroad and the Fairmont Coal Companies.

One of the assignments of error assails the correctness of the conclusion of the court below to the effect that, compatibly with the act to regulate commerce, there was power under the circumstances disclosed by the record to consider the subject-matters which were complained of, and to award the relief concerning them which was prayed. Indeed, the nature of the controversy and the relief which it requires is such that, even without the assigned error, to which we have referred, the question at the very threshold necessarily arises and commands our attention as to whether there was power in the courts, under the circumstances disclosed by the record, to grant the relief prayed consistently with the provisions of the act to regulate commerce, and to that subject we therefore at once come.

To a consideration of this question it is essential to at once summarily and accurately fix the subject-matter of the alleged grievances and the precise character of the relief required in order to remedy the evils complained of upon the as-

sumption of their existence. As to the first, it is patent that the grievances involve acts of the Baltimore and Ohio Railroad, regulations adopted by that company and alleged dealings by the other corporations, all of which, it is asserted, concern interstate commerce, and all of which, it is alleged, are in direct violation of the duty imposed upon the railroad company by the provisions of the act to regulate commerce. As to the second, in view of the nature and character of the acts assailed, of the prayer for relief which we have previously excerpted and of the relief which the court below directed to be awarded, it is equally clear that a prohibition, by way of mandamus, against the act is sought and an order, by way of mandamus, was invoked, and was allowed which must operate, by judicial decree, upon all the numerous parties and various interests as a rule or regulation as to the matters complained of for the conduct of interstate commerce in the future. When the situation is thus defined we see no escape from the conclusion that the grievances complained of were primarily within the administrative competency of the Interstate Commerce Commission and not subject to be judicially enforced, at least until that body, clothed by the statute with authority on the subject, had been afforded by a complaint made to it the opportunity to exert its administrative functions.

The controversy is controlled by the considerations which governed the ruling made in *Texas & Pacific Ry. Company* v. *Abilene Cotton Oil Co.*, 204 U. S. 426. In that case suit was brought in a court of the State of Texas to recover, because of an exaction by a carrier, on an interstate shipment, of an alleged unreasonable rate, although the rate charged was that stated in the schedules duly filed and published in accordance with the act to regulate commerce. After great consideration, it was held that the relief prayed was inconsistent with the act to regulate commerce, since by that act the rates, as filed, were controlling until they had been declared to be unreasonable by the Interstate Commerce Commission on a complaint made to that body. It was pointed out that any other view would give

rise to inextricable confusion, would create unjust preferences and undue discriminations, would frustrate the purposes of the act, and, in effect, cause the act to destroy itself. The ruling there made dealt with the provisions of the act as they existed prior to the amendments adopted in 1906, and when those amendments are considered they render, if possible, more imperative the construction given to the act by that ruling, since, by § 15, as enacted by the amendment of June 29, 1906, the commission is empowered, indeed it is made its duty, in disposing of a complaint, not only to determine the legality of the practice alleged to give rise to an unjust preference or undue discrimination, and to forbid the same, but, moreover, to direct the practice to be followed as to such subject for a future period, not exceeding two years, with power in the commission, if it finds reason to do so, to suspend, modify, or set aside the same, the order, however, to become operative without judicial action. In considering § 15 in the case of *Interstate Commerce Commission* v. *Illinois Central Railroad Co.*, just decided, *ante*, p. 452, it was pointed out that the effect of the section was to cause it to come to pass that courts, in determining whether an order of the commission should be suspended or enjoined, were without power to invade the administrative functions vested in the commission, and therefore could not set aside an order duly made on a mere exercise of judgment as to its wisdom or expediency. Under these circumstances it is apparent, as we have said, that these amendments add to the cogency of the reasoning which led to the conclusion in the *Abilene case*, that the primary interference of the courts with the administrative functions of the commission was wholly incompatible with the act to regulate commerce. This result is easily illustrated. A particular regulation of a carrier engaged in interstate commerce is assailed in the courts as unjustly preferential and discriminatory. Upon the facts found the complaint is declared to be well founded. The administrative powers of the commission are invoked concerning a regulation of like character upon a similar com-

plaint. The commission finds, from the evidence before it, that the regulation is not unjustly discriminatory. Which would prevail? If both, then discrimination and preference would result from the very prevalence of the two methods of procedure. If, on the contrary, the commission was bound to follow the previous action of the courts, then it is apparent that its power to perform its administrative functions would be curtailed, if not destroyed. On the other hand, if the action of the commission was to prevail, then the function exercised by the court would not have been judicial in character, since its final conclusion would be susceptible of being set aside by the action of a mere administrative body. That these illustrations are not imaginary is established not only by this record but by the record in the case of the *The Interstate Commerce Commission* v. *Illinois Central Railroad Company, ante*, p. 452.

We say this record, because, as has been pointed out, one of the questions which we would be called upon to decide if the merits were open is whether the court below was right in holding that if anything but the physical capacity of a mine was taken into consideration by a railroad company in rating the mine for car distribution in time of car shortage, the act to regulate commerce would be violated, and therefore the system adopted by the Baltimore and Ohio Railroad Company was repugnant to the act, because it made not alone the physical capacity but past shipments factors to be considered. But the reports of the Interstate Commerce Commission show that on a complaint made to that body on the subject of the system of mine rating of the Baltimore and Ohio Railroad Company, the commission, before the decision of the Circuit Court of Appeals in this case was announced, had expressly refused to hold that the system was either preferential or prejudicial within the act to regulate commerce. In that report, speaking of the Baltimore and Ohio system of mine rating, it was said (*Rail & River Coal Co.* v. *B. & O. R. R. Co.*, 14 I. C. C. Rep. 94):

"This method of rating mines was adopted by the defendant in 1902, after a careful examination of the various systems in force on other lines. It was intended as a compromise between ratings based on physical capacity only and ratings based on commercial capacity only."

And after elaborately weighing the matter, it was said (p. 95): "In combining the two systems the defendant has adopted a middle ground, apparently upon the thought that neither the physical nor the commercial capacity is always a fair test. We are not prepared, on this record, to say that there is no force in that view, and that a system of mine rating based upon a combination of the physical and commercial capacities of the several mines does not more closely approximate the actual car requirements of the mines than a system based upon physical capacity only."

We say also the *Illinois Central* case, since it is shown in that case that when the railroad company changed its regulations, presumably to have them conform to the administrative ruling made by the commission in the *Hocking Valley* case, such change was prevented from going into effect by an injunction issued by the Circuit Court of the United States for the Northern District of Illinois in the *Majestic Coal Company* case. And when the commission came to discharge its duty upon the complaint made to it in the *Illinois Central* case it was put to the alternative of either abdicating its administrative duties or making an order in violation of the injunction.

And the destructive effect upon the system of regulation devised by the act to regulate commerce, which these illustrations show must be the result of construing that act as giving authority to the courts, without the preliminary action of the commission, to consider and pass upon the administrative questions which the statute has primarily confided to that body, may be greatly multiplied. This is shown by the opinion of the commission in the *Baltimore and Ohio* case, to which we have already referred, where the decisions of

other lower courts are referred to in conflict with the opinion of the court below in this case as to mine rating, and not in harmony with the views expressed by the commission in the *Baltimore and Ohio case.*

The court below deemed that it was its duty to award to the coal company the relief by mandamus which was prayed, upon the theory that § 23 of the act to regulate commerce rendered it imperative to do so, this conclusion being specially based upon the provision of that section authorizing the remedy of mandamus to compel carriers "to furnish cars or other facilities for transportation for the party applying for the writ."

The section in question is as follows (§ 10 of Act of March 2, 1889, c. 382, 25 Stat. 855, 862):

"SEC. 23. That the Circuit and District Courts of the United States shall have jurisdiction upon the relation of any person or persons, firm, or corporation, alleging such violation by a common carrier, of any of the provisions of the act of which this is a supplement and all acts amendatory thereof as prevents the relator from having interstate traffic moved by said common carrier at the same rates as are charged, or upon terms or conditions as favorable as those given by said common carrier for like traffic under similar conditions to any other shipper, to issue a writ or writs of mandamus against said common carrier, commanding such common carrier to move and transport the traffic, or to furnish cars or other facilities for transportation for the party applying for the writ; *Provided,* That if any question of fact as to the proper compensation to the common carrier for the service to be enforced by the writ is raised by the pleadings, the writ of peremptory mandamus may issue, notwithstanding such question of fact is undetermined, upon such terms as to security, payment of money into the court, or otherwise, as the court may think proper, pending the determination of the question of fact: *Provided,* That the remedy hereby given by writ of mandamus shall be cumulative, and shall not be held

to exclude or interfere with other remedies provided by this act or the act to which it is a supplement."

That it is not necessary to point out that there is ample scope for giving effect to and applying the remedy embraced in § 23, if that section be construed in harmony with the act of which it forms a part, and not as destructive of one of the main purposes of the act, is, we think, obvious. It is to be observed that the section, besides empowering the use of the writ of mandamus to compel the furnishing of cars and other facilities for transportation, also authorizes the use of that writ for the purpose of compelling the movement of traffic "at the same rates as are charged, or upon terms or conditions as favorable as those given by said common carrier for like traffic under similar conditions to any other shipper." As it was settled in the *Abilene* case that the right to question in the courts the rates established in accordance with the act to regulate commerce without previous resort, by complaint, to the commission, in order to determine their unreasonableness, would be destructive of the act, and therefore was not permissible, that ruling is equally applicable to the provision as to furnishing cars contained in § 23, which is here relied upon. But as we are required, for the determination of the case now before us, to consider the scope of the act to regulate commerce as now existing, as a result of the amendments of 1906, we shall not rest our conclusion alone upon the persuasive force of the reasoning which constrained to the conclusion announced in the *Abilene* case. Speaking generally, it is true to say that, prior to 1889, although the prohibitions of the act to regulate commerce as to preferences and discriminations were far reaching, the mechanism provided by the statute for the enforcement of orders of the commission on the subject, as well as those concerning a finding as to unreasonable rates, were deemed to be in many respects ineffective, or at least tardy in operation or unsatisfactory in prompt remedial results, and this because immediate effect was not given to the orders of the commission, but the aid

of judicial authority was required as a prerequisite for such result. Section 23, here relied upon, was not part of the original act, but, as we have said, was added thereto on March 2, 1889, for the obvious purpose of making the remedial processes of the act more speedy and efficacious. Now, it cannot in reason be questioned that among the purposes contemplated by the amendments adopted in 1906 was the curing of the presumed remedial inefficiency of the act by supplying efficient means for giving effect to the orders of the commission, made in the exertion of the authority conferred upon that body. To that end one of the amendments, § 15, gives operative effect to the orders of the commission without the sanction of previous judicial authority, and endows that body with the power, not only as to unreasonable rates, but as to practices found upon complaint to be unduly prejudicial and unjustly discriminatory, to correct the same by its order, which order should have effect within the period fixed in the statute, and, to enforce these provisions, penalties and forfeitures are provided. Sec. 16. It being demonstrable, as we have seen, that to give to § 23 the broad meaning which the court below affixed to it would be to destroy or render inefficacious the remedial purposes of the amendments enacted in 1906, it must follow that such construction cannot be adopted, since to do so would compel us to hold that the wide and far-reaching remedies created by the amendments of 1906 were, in effect, destroyed by the narrower remedial processes which had been previously enacted in 1889. This conclusion being in reason impossible, it must follow that, construing the provisions of § 23 in the light of and in harmony with the amendments adopted in 1906, the remedy afforded by that section, in the cases which it embraces, must be limited either to the performance of duties which are so plain and so independent of previous administrative action of the commission as not to require a prerequisite exertion of power by that body, or to compelling the performance of duties which plainly arise from the obliga-

tory force which the statute attaches to orders of the commission, rendered within the lawful scope of its authority, until such orders are set aside by the commission or enjoined by the courts.

Nor is there anything in the contention that the decision in *Southern Ry. Co.* v. *Tift*, 206 U. S. 428, qualifies the ruling in the *Abilene case*, and is an authority supporting the right to resort to the courts in advance of action by the commission for relief against unreasonable rates or unjust discriminatory practices, which, from their nature, primarily require action by the commission. While it is true that the original bill in the *Tift case* sought relief from alleged unreasonable rates before action by the commission, yet, as said by this court (p. 437):

"The Circuit Court granted no relief prejudicial to appellants on the original bill. It sent the parties to the Interstate Commerce Commission, where, upon sufficient pleadings, identical with those before the court, and upon testimony adduced upon the issues made, the decision was adverse to the appellants. This action of the commission, with its findings and conclusions, was presented to the Circuit Court, and it was upon these, in effect, the decree of the court was rendered. There was no demurrer to that petition, and the testimony taken before the commission was stipulated into the case, and the opinion of the court recites that, 'with equal meritorious purpose, counsel for respective parties agreed that this would stand for and be the hearing for final decree in equity.'"

The judgment of the Circuit Court of Appeals is reversed, and the cause is remanded to the Circuit Court with directions to set aside its judgment, and enter judgment dismissing the petition.

*Reversed.*

MR. JUSTICE HARLAN and MR. JUSTICE BREWER dissent.