**PENNSYLVANIA R. CO. v. UNITED STATES et al. (two cases).**

(District Court, W. D. Pennsylvania. November 8, 1915.)

Nos. 38, 39.

COMMERCE ⬤➡85—POWERS OF INTERSTATE COMMERCE COMMISSION—ORDER REQUIRING RAILROAD COMPANY TO PROVIDE AND FURNISH TANK CARS.

Under Interstate Commerce Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379, as amended by Act June 29, 1906, c. 3591, § 1, 34 Stat. 584 (Comp. St. 1913, § 8563), which defines "transportation" as including cars, and provides that "it shall be the duty of every carrier * * * to provide and furnish such transportation upon reasonable request therefor," such duty to provide and furnish cars is no broader than that imposed by the common law, and the act does not empower the Interstate Commerce Commission, upon a determination that such cars are reasonably necessary to a proper car service, to order a railroad company to provide and furnish tank cars for use by an oil refinery, where the company does not possess such cars, or not in number sufficient to meet the requirement.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 138; Dec. Dig. ⬤➡85.

For other definitions, see Words and Phrases, First and Second Series, Transportation.]

Thomson, District Judge, dissenting.

In Equity. Petitions by the Pennsylvania Railroad Company against the United States and the Crew-Levick Company, and against the United States and the Pennsylvania Paraffine Works, for injunctions suspending orders of the Interstate Commerce Commission. Injunctions granted.

---

[2]NOTE.—Plaintiff elected not to plead over, and has appealed from a decree of dismissal.

Petition for an interlocutory order or preliminary injunction restraining and suspending, until the final determination of this cause, an order of the Interstate Commerce Commission, requiring the Pennsylvania Railroad Company to cease and desist from pursuing certain practices found to be in violation of the provisions of the act to regulate commerce. Motion to dismiss the petition.

The refined oil product of this country is carried and transported in tank cars, by pipe lines and by rail in barrels or similar containers.

The cost of carrying oil in barrels is 3½ cents a gallon above the cost of carrying it in tank cars, due to freight charges on the weight of the barrels and to the added cost of handling, maintenance and replacement, making shipment by this method expensive, if not prohibitive.

Ninety-one per cent of the refined oil product is carried in tank cars, the remainder being carried by pipe lines and by rail in barrels. The oil carried in tank cars is consigned and shipped almost exclusively in privately owned tank cars, that is, tank cars owned by or leased to the shipper, for the use of which the carrier pays wheelage. The number of tank cars in the United States is 40,000. The number of privately owned tank cars east of the Mississippi River is 27,700. The Pennsylvania Railroad Company owns 499. Other carriers east of the Mississippi River own in the aggregate 303. Some carriers own none.

Fifty-two kinds of articles, used for food and in the arts, are shipped in tank cars. Differences in the nature and uses of the articles make impossible the interchange of tank cars for their shipment.

The Pennsylvania Railroad Company publishes rates for the transportation of oil in tank cars, and furnishes tank cars within the limit of its supply.

The oil refineries of the Pennsylvania Paraffine Works and Crew-Levick Company are situated in the state of Pennsylvania and are served by the Pennsylvania Railroad Company and the New York Central Railroad Company. The Pennsylvania Paraffine Works ships monthly about 750,000 gallons of refined oil, of which 91 per cent. moves in tank cars, 1½ per cent. in barrels and the remainder in pipe lines.

Crew-Levick Company ships monthly about 500,000 gallons of refined oil, of which 86 per cent. moves in tank cars and about 5 per cent. in barrels, and the remainder in pipe lines. The former company owns 54 tank cars and the latter company 57.

It developed in the testimony that the tank cars furnished by the railroad company, in addition to the complainants' privately owned tank cars, were not at all times sufficient to meet the requirements of the complainants' business. During a specimen period, it appears that of the monthly shipments of the product of the former company, 83 carloads were carried in its privately owned tank cars and 13 carloads in tank cars furnished by the railroad company; and of the monthly shipments of the product of the latter company, 70 carloads were carried in its privately owned tank cars and 12 carloads in tank cars provided by the railroad company.

The tank cars owned by the two companies, together with their pro rata share in the distribution of the tank cars of the railroad company, being inadequate for their requirements, and conceiving it to be the duty of the railroad company to furnish tank cars of the type and in the number required, the two companies demanded of the Pennsylvania Railroad Company a sufficient number of tank cars in which to ship their monthly product. To this demand the railroad company replied, "We beg to say that the railroad company is not prepared to increase its present tank car equipment, but is prepared to transport the commodity, when properly contained in barrels or other similar containers, at rates that are fair, reasonable and non-discriminatory." Whereupon complaints were lodged with the Interstate Commerce Commission, a hearing held, and the following order made:

"It is ordered, that the Pennsylvania Railroad Company be, and it is hereby, notified and required to cease and desist on or before August 15, 1915, and thereafter to abstain, from refusing upon reasonable request and reasonable notice therefor to provide and furnish tank cars to the complainants herein for interstate shipments of petroleum products, which re-

fusal has been found in said report to be in violation of the provisions of the act to regulate commerce and amendments thereto.

"It is further ordered, that said defendant be, and it is hereby, notified and required to provide, on or before August 15, 1915, and thereafter to furnish, upon reasonable request and reasonable notice, at complainants' respective refineries, tank cars in sufficient number to transport said complainants' normal shipments in interstate commerce.

"And it is further ordered, that this order shall continue in force for a period of not less than two years from the date when it shall take effect."

After securing an extension of the order, the railroad company filed its petition in this court, praying that a preliminary injunction be entered restraining and suspending the order of the Interstate Commerce Commission. The Government moved to dismiss the petition. The motion and the petition were heard together.

Henry Wolf Bikle, of Philadelphia, Pa., and Thomas Patterson, of Pittsburgh, Pa. (Patterson, Crawford & Miller, of Pittsburgh, Pa., on the brief), for complainant.

Blackburn Esterline, Sp. Asst. Atty. Gen., of Chicago, Ill. (E. Lowry Humes, U. S. Atty., of Pittsburgh, Pa., on the brief), for the United States.

Edward W. Hines, of Washington, D. C. (Joseph W. Folk, of Washington, D. C., on the brief), for Interstate Commerce Commission.

George E. Spring, of Franklinville, N. Y., and C. D. Chamberlin, of Cleveland, Ohio, for Crew-Levick Co.

Before WOOLLEY, Circuit Judge, and ORR and THOMSON, District Judges.

WOOLLEY, Circuit Judge (after stating the facts as above). The proceeding now before the court was instituted and conducted under section 13 of the act to regulate commerce (Comp. St. 1913, § 8581), giving to any person complaining of anything done or omitted to be done by a common carrier in contravention of the provisions of the act, the right to apply to the Interstate Commerce Commission for redress; and after a finding adverse to the carrier, the order entered was made under section 15 of the act, which provides in effect that whenever, after hearing, the Commission shall be of opinion that a practice of a carrier is unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial or otherwise in violation of any of the provisions of the act, the Commission is authorized and empowered to determine and prescribe what practice is just, fair and reasonable, and to order the carrier to cease and desist from the unlawful practice, and thereafter to conform to and observe the regulation or practice prescribed, under penalty of five thousand dollars for each offense.

The practice of the railroad company found by the Commission in this instance to be violative of the statute, is not that the railroad company discriminated against the shipper by an unequal distribution of tank cars. It is conceded that the Commission may require a carrier to desist from a discriminatory practice in car distribution. This is one of the admitted powers of the Commission to be exerted over a carrier in the use of the instrumentalities which it possesses. What

227 F.—58

the Commission found was that the railroad company was guilty of an unjust and an unreasonable practice in not possessing or in not acquiring and furnishing tank cars in sufficient number to meet the requirements of the complainants' business.

The question in this case, in the abstract, is whether the act to regulate commerce as amended, imposes upon a carrier the duty to acquire and to provide and furnish transportation of a type that, physically or economically, is best adapted to the needs and uses of the shipper, of which the Interstate Commerce Commission is the judge. The precise question is whether the Interstate Commerce Commission has power to compel the Pennsylvania Railroad Company to purchase and acquire tank cars for the shipment of oil, and to provide the same to complaining shippers upon requests which the Commission may adjudge reasonable.

For the validity of its order, the Interstate Commerce Commission relies upon several provisions of the act to regulate commerce as amended, and upon certain changes and differences in the act created by its amendments. The first section of the act, both in its original and amended state, contains definitions of different branches of the subject with which the act deals. The terms "common carrier," "railroad" and "transportation" are, by express language, given their statutory meaning. Section 1 of the act of 1887 provides that "the term 'transportation' shall include all instrumentalities of shipment or carriage." As amended by the act of 1906, the term "transportation" is enlarged and is made to "include cars and other vehicles and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported." Having stated of what transportation consists, the section prescribes it to "be the duty of every carrier * * * to provide and furnish such transportation upon reasonable request therefor."

Excerpts from several opinions of the Supreme Court were cited in support of the Government's contention that a railroad company, holding itself out as a carrier, is under a legal obligation arising out of the fact of its employment, to provide transportation means and facilities commensurate with the demands of shippers, without regard to whether they possess them or have the money with which to acquire them. These excerpts were, of course, not cited as decisive of the question in issue, because upon examination it is disclosed that the cases from which they were taken were decisive of matters altogether different. These expressions of the Supreme Court, standing alone and considered without reference to the facts of the cases in which they appear, seem to support the Government's contention, but an examination of the cases discloses that the suitable and necessary means and facilities which the Supreme Court has said the carrier must provide, have especial reference and relation to the facts of those cases, which in nearly every instance present questions of discrimination or of "service in connection with the receipt, delivery, elevation and transfer in

transit, ventilation, refrigeration or icing, storage and handling of property transported," as specifically provided by the statute. In none of them was the question raised or decided nor in any did the Supreme Court reveal its opinion as to whether there devolved upon a carrier a statutory duty to provide and furnish transportation of a type it did not possess, or to acquire such transportation in order to provide and furnish the same upon reasonable request. Railroad Co. v. Pratt, 22 Wall. 123, 128, 22 L. Ed. 827; Covington Stockyards Co. v. Keith, 139 U. S. 128, 133, 11 Sup. Ct. 469, 35 L. Ed. 73; Arlington Heights Fruit Exchange v. Southern Pacific Co., 20 Interst. Com. Com'n R. 106, affirmed by the Supreme Court in Atchison Ry. Co. v. United States, 232 U. S. 199, 34 Sup. Ct. 291, 58 L. Ed. 568; Chicago, Rock Island & Pacific Ry. Co. v. Hardwick Farmers' Elevator Co., 226 U. S. 426, 33 Sup. Ct. 174, 57 L. Ed. 284, 46 L. R. A. (N. S.) 203; Missouri, Kansas & Texas Ry. Co. v. Harris, 234 U. S. 412, 418, 34 Sup. Ct. 790, 58 L. Ed. 1377; Yazoo & Mississippi Valley R. R. Co. v. Greenwood Grocery Co., 227 U. S. 1, 33 Sup. Ct. 213, 57 L. Ed. 389; St. Louis, Iron Mountain & Southern Ry. Co. v. Edwards, 227 U. S. 265, 33 Sup. Ct. 262, 57 L. Ed. 506; Hampton v. St. Louis, Iron Mountain & Southern Ry. Co., 227 U. S. 456, 33 Sup. Ct. 263, 57 L. Ed. 596; Penn Refining Co. v. Western New York & Pennsylvania R. R. Co., 208 U. S. 208, 28 Sup. Ct. 268, 52 L. Ed. 456; Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075; Baltimore & Ohio R. R. Co. v. United States ex rel. Pitcairn Coal Co., 215 U. S. 481, 30 Sup. Ct. 164, 54 L. Ed. 292.

There is thus presented for decision, with little if any aid from previous deliverances by the courts, the original question which divided the Interstate Commerce Commission in this case and in the case of Vulcan Coal & Mining Co. v. I. C. R. R. Co., 33 Interst. Com. Com'n R. 52, whether the duty imposed upon a carrier to provide and furnish cars to the shipper is the duty imposed by the common law or is a different and a broader duty prescribed by the statute, and whether the power of the Interstate Commerce Commission to prevent undue preference and unjust discrimination in the use of a carrier's cars has been enlarged and expanded into a power to control the "practice" of carriers, by determining and prescribing the type and character of "all [their] instrumentalities and facilities of shipment or carriage," in order to procure for the shipper a better, safer and more economic transportation service.

In seeking the authority of the Commission to make the order in controversy, we have nothing to do with the merit of the order, the injustice of the practice found to exist, or the wisdom of the practice established (Texas & Pacific Ry. Co. v. I. C. C., 162 U. S. 197, 219, 16 Sup. Ct. 666, 40 L. Ed. 940; I. C. C. v. Alabama Midland Ry. Co., 168 U. S. 144, 170, 18 Sup. Ct. 45, 42 L. Ed. 414); nor have we anything to do with the effect of the order upon private car lines. We are concerned only with the law under which the order was made and the Commission acted, assuming its finding of fact to be conclusively correct (I. C. C. v. Illinois Central Ry. Co., 215 U. S. 452, 30 Sup.

Ct. 155, 54 L. Ed. 280; Baltimore & Ohio R. Co. v. United States ex rel. Pitcairn Coal Co., 215 U. S. 481, 30 Sup. Ct. 164, 54 L. Ed. 292; Pennsylvania Co. v. United States, 236 U. S. 351, 361, 35 Sup. Ct. 370, 59 L. Ed. 616).

The question of the duty of the carrier and the correlative question of the Commission's power to enforce the performance of that duty, as they are presented in this case, had their rise in a change in the definition of the term "transportation" made by the amendment of 1906. Section 1 of the original act prescribed that "the term 'transportation' shall include all instrumentalities of shipment or carriage." Instrumentalities of shipment of course include cars, and cars have been treated as such from the date of the act to the date of its amendment in 1906. But in Scofield v. Lake Shore & Michigan Southern Ry. Co., 2 Interst. Com. Com'n R. 67, 76, 4 Interst. Com. Com'n R. 158, the Interstate Commerce Commission considered that the sole duty of a carrier to furnish cars was that imposed by the common law, and that the statute creating the Commission did not clothe it with power to determine the instrumentalities of shipment to be employed by a carrier or to require a carrier to use in its business the kind and number of cars which the Commission may deem necessary for a proper car service. In discussing this case, the Commission said:

That "the power if it should be held to exist at all, on the part of the Interstate Commerce Commission to require a carrier to furnish tank cars when that carrier is furnishing none whatever in its business, would apply equally to sleeping cars, parlor cars, fruit cars, refrigerator cars, and all manner of cars as occasion might require, and would be limited only to the necessities of interstate commerce and the discretion of the Interstate Commerce Commission. A power so extraordinary and so vital, reached by construction, could not justly rest upon any less foundation than that of direct expression or necessary implication, and we find neither of those in the statute."

It is contended, however, that by the amendatory act of 1906, changing the definition of the term "transportation," there is such direct statutory expression conferring such extraordinary power, and that the measure of duty theretofore resting upon the carrier to furnish cars was changed from a common law duty, with resort to the courts for its violation, to a statutory duty, with redress for its violation by the Interstate Commerce Commission. The act of 1906 as before quoted, prescribes that "the term 'transportation' shall include cars and other vehicles and all instrumentalities and facilities of shipment or carriage" and certain defined services to be rendered in connection therewith. The services defined are the principal additions to the definition, and relate to the receipt, delivery, transfer, ventilation, refrigeration, storage, and handling of property transported. With these we have nothing to do in this case, except to note that they constitute the principal, if not the entire, additions to the old definition, and are subject matters of the Commission's control not embraced in the original act. While the word "cars" was not used in the definition of transportation as contained in the original act, it has never been doubted that in the words "instrumentalities of shipment" and within the term "transportation," cars were included.

The definition of the term "transportation" as it appears in the amendment of 1906, so far as it relates to cars, does nothing more than express what was implied in the original definition and contains nothing which suggests that in furnishing transportation there shall rest upon the carrier a duty to furnish cars of a kind different from those required of the carrier under the original act.

We find no case prior to the amendatory act of 1906 which questioned that cars were instrumentalities of shipment or carriage. If such a question existed, then the act of 1906 naming cars as one of the instrumentalities of shipment, might have been a change with a purpose, creating a difference in legal effect.

In seeking the effect of the amendment of 1906, inquiry may be made with respect to the purpose of Congress in enacting it. It is apparent from the addition to the definition of "transportation" contained in the amendment, that Congress intended and clearly succeeded in including within that term certain services which, theretofore, had not been embraced within it and over which Congress deemed it advisable that the Interstate Commerce Commission should have power and control. These were ventilation, refrigeration, icing, storage and handling of property transported. This power was conferred upon the Commission for the avowed purpose, among others, of relieving the shipper of the task and annoyance of dealing with more than one person. These were new matters and therefore were additions to what was meant by transportation, as defined in the original act. But the addition of the word "cars" in the amendment made no addition to the definition in the original act, because cars were already embraced within it.

We find nothing in the original or amended act which, by express language, imposes upon a carrier the extraordinary duty or confers upon the Interstate Commerce Commission the extraordinary power claimed by the government in this proceeding. If they exist, they can be found only by implication, and it is doubtful if Congress would leave to implication an intention to impose so onerous a duty and to grant so great a power. On the other hand, we find in the act, by clear expression, duties imposed upon carriers which are not absolute in their nature, but are qualified by the ability of the carriers to conform to the duties prescribed.

The provision of the act requiring a carrier to maintain and operate switch connections with lateral or branch line railroads, appearing in the last paragraph of the first section of the act, imposes upon a carrier the duty to "furnish cars for the movement of such traffic *to the best of its ability* without discrimination in favor of or against any such shipper." The words, "to the best of its ability," of course, qualify the duty to maintain switch connections, and do not qualify the prohibited discrimination.

Again, in section 3 of the act (Comp. St. 1913, § 8565), it is provided that:

"Every common carrier * * * shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property."

Here again, the carriers' duty to provide and furnish facilities of transportation is not absolute. The duty is laid upon them "according to their respective powers." Such expressions rather raise the implication that Congress did not intend to place an absolute and unqualified duty upon carriers to furnish cars of a certain type whether they had them or not, and if they did not have them then to acquire them whether they had the money or not. Restricting our construction of the act to its words, and finding nothing by implication that changes or qualifies their meaning, we are of opinion that the amendment of 1906, including cars within the definition of "transportation," added nothing to the original duty of the carrier as prescribed by the original act and as interpreted by the Commission, and vested in the Commission no increase of power over cars as instrumentalities of shipment. If, under the act as amended, no different or greater duty is imposed upon a carrier with respect to furnishing and providing cars than was prescribed by the original act, then the practice of the carrier found unlawful in this case was not in violation of the statute, and the order of the Commission, directing the carrier to desist from that practice, was an exercise of power not conferred by law.

The act to regulate commerce does not confer upon the Interstate Commerce Commission all power over cars and other instrumentalities of shipment. Congress has reserved unto itself, and from time to time has exercised, power to control and regulate certain instrumentalities of shipment, notably by the acts establishing the standard height of draw bars, prescribing safety appliances and regulating the hours of service of the carriers' employés. But aside from special enactments of this class, federal legislation regulating commerce, in so far at least as it is contained in the act of 1887 and its amendments, has thus far left carriers free to exercise their own judgment in the purchase, construction and equipment of their roads and in the selection of their rolling stock. By this legislation, federal control has been assumed over the use to which the carriers' roads and equipment are put, to the end that the flow of commerce, in the employment of those instrumentalities, may not be impeded, and that unjust rates shall not be charged and unfair practices pursued to the injury of persons and localities. The law clearly confers upon the Commission power to so regulate the use of the facilities possessed by the carrier that there shall be no unjust discrimination, but we find nothing in the law which confers upon the Commission power to compel a carrier to acquire facilities it does not possess or to acquire better facilities than those it possesses, not with the object of preventing discrimination and preferences, but in order that the shipper may have larger, better, and perhaps more economical facilities. We are of opinion that in making the order, the Interstate Commerce Commission exceeded its statutory power, and that the order should be suspended and annulled in accordance with the prayer of the petition.

THOMSON, District Judge (dissenting). Finding myself unable to concur in the conclusion reached by the majority of the court, I have thought proper, in view of the importance of the case, to briefly assign the reasons which control my judgment.

We have nothing to do with the wisdom of the order. The findings of the Commission are presumed to be true, and to have justified its action, if only the power to exercise it exists. On this question of power alone, the Commission was divided. If there rested no legal duty on the carrier to provide the transportation called for, it follows that the Commission was without power to make the order in question. The conclusion of the court adverse to the action of the Commission, is concisely set forth in the concluding portion of the majority opinion thus:

"The law clearly confers upon the Commission power to so regulate the use of the facilities possessed by the carrier that there shall be no unjust discrimination, but we find nothing in the law which confers upon the Commission power to compel a carrier to acquire facilities it does not possess or to acquire better facilities than those it possesses, not with the object of preventing discrimination and preferences, but in order that the shipper may have larger, better, and perhaps more economical facilities."

This is the issue, and the solution of the question must be found mainly in the proper interpretation of the term "transportation," as used in the amendment of 1906.

In the original act of February 4, 1887, it is said:

"The term 'transportation' shall include all instrumentalities of shipment or carriage."

These words are clearly comprehensive enough to include cars as an instrument of shipment. But we need not stop to conjecture as to their full breadth and meaning. It is sufficient that Congress thought proper to enlarge the scope of the term "transportation" by providing in the act of 1906 as follows:

"The term 'transportation' shall include cars and other vehicles and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation and transfer in transit, ventilation, refrigeration or icing, storage and handling of property transported, and it shall be the duty of every carrier subject to the provisions of this act to provide and furnish such transportation upon reasonable request therefor, and to establish through routes and just and reasonable rates applicable thereto."

This, instead of being a concise and accurate definition of the term "transportation," is rather a legislative declaration of what the term shall include. Much broader than the words, "all instrumentalities of shipment and carriage," in the original act, are the words of the amendment, "cars and other vehicles and all instrumentalities and facilities of shipment or carriage." The very comprehensive words "*facilities* of shipment and carriage" were a significant addition to the original act. These words are again made more comprehensive by the words which follow:

"Irrespective of ownership or of any contract, express or implied, for the use thereof."

Whether held by the carrier by purchase, hire, exchange, lease, bailment, or any contract for their use, express or implied, they are to be regarded as the instruments of the carrier, and the shipper, as well

as the Commission, is thus relieved of the annoyance of dealing with more than one person. The scope of the term transportation is again enlarged by the use of the words:

"And all services in connection with the receipt, delivery, elevation and transfer in transit, ventilation, refrigeration or icing, storage and handling of property transported."

Having thus defined transportation, it is then declared to be the duty of every carrier, subject to the provisions of the act, to provide and furnish such transportation upon reasonable request therefor.

Whatever may have been the duty resting on a carrier at common law to furnish transportation for the shipper's property, it admits of no doubt that the furnishing of transportation, as defined by the act, has been made a clear statutory duty of the carrier. As was said by Chief Justice White in Chicago, R. I. & Pac. R. R. Co. v. Hardwick Elevator Co., 226 U. S. 426, 33 Sup. Ct. 174, 57 L. Ed. 284, 46 L. R. A. (N. S.) 203:

"The purpose of Congress to specifically impose a duty upon a carrier in respect to the furnishing of cars for interstate traffic is of course by these provisions clearly declared. * * * Not only is there then a specific duty imposed to furnish cars for interstate traffic upon reasonable request therefor, but other applicable sections of the act to regulate commerce give remedies for the violation of that duty."

It is plainly the duty of the carrier, not only to furnish cars on reasonable request, but to furnish cars reasonably suitable for the proper transportation of the freight to be shipped. This general proposition is stated by Hutchinson on Carriers, § 536, as follows:

"If the goods are of such a nature as to require for their protection some other kind of car than that required for ordinary goods, and cars adapted to the necessity are known and in customary use by carriers, it is the duty of the carrier, where he accepts the goods, to provide such cars for their carriage."

In Covington Stockyards Co. v. Keith, 139 U. S. 128, 11 Sup. Ct. 469, 35 L. Ed. 73, Justice Harlan, speaking for the Supreme Court, said:

"The railroad company, holding itself out as a carrier of live stock, was under a legal obligation, arising out of the nature of its employment, to provide suitable and necessary means and facilities for receiving live stock offered to it for shipment over its road and connections, as well as for discharging such stock after it reaches the place to which it is consigned. The vital question in respect to such matters is whether the means and facilities so furnished by the carrier or by some one in its behalf are sufficient for the reasonable accommodation of the public."

In the same opinion the court says:

"The carrier must at all times be in proper condition both to receive from the shipper and to deliver to the consignee, according to the nature of the property to be transported, as well as to the necessities of the respective localities in which it is received and delivered."

This case, assuming that proper facilities for the trasportation of the stock must be furnished, goes further, and extends the duty of the carrier to providing suitable means for its receipt and discharge.

If, then, it is the duty of the carrier on reasonable request to fur-

nish coal cars to the shipper of coal, stock cars to the shipper of live stock, fruit cars with refrigeration for the shipper of fruit, on no principle could the oil shipper be denied cars reasonably suited for the shipment of oil. The word "reasonable," as used in the act, is a qualifying and saving term. Not merely the demands and needs of the shipper are to be considered, but the circumstances of the carrier and the rights of the public as well. The fitness and efficiency of the transportation requested, whether the facilities of shipment would be made better and more economical, the public advantage to be derived therefrom, the cost and expense in relation to the benefit resulting, all the circumstances, time and place and means, as affecting the carrier and its ability to supply the transportation demanded—these and all other relevant matters may be considered in determining the reasonableness of the shipper's demand. If the request be reasonable, it is the legal duty of the carrier to comply with it; if unreasonable, no such duty devolves upon the carrier. And this question of fact, in case of dispute, the Commission must decide. Almost all duties are relative rather than absolute, and the exercise of a clearly vested power largely depends upon the facts which call for its exercise. Even the clearly expressed duty of the carrier to furnish cars on reasonable request is not absolute. Hampton v. St. L., Iron Mt. & S. Ry. Co., 227 U. S. 467, 33 Sup. Ct. 263, 57 L. Ed. 596. Thus the right of the shipper to demand transportation, on the one hand, is conditioned on the fact that his request be reasonable; and the duty, on the other, to comply is not absolute, but dependent on the facts of the case. We are not passing on some abstract proposition as to the power of the Commission to order, without restraint, the equipment and furnishing of cars, without reference to conditions or circumstances. We are passing on a concrete question based on specific facts, conclusively found by the Commission. It would be easy to imagine on the part of a shipper an unwarranted and unreasonable request, and on the part of the carrier an arbitrary and unjust denial of a reasonable demand. The Interstate Commerce Commission is the tribunal standing between the parties, with power to hear and determine, and especially competent by reason of experience to determine, with justness and uniformity of decision.

I cannot agree with the proposition that the duty imposed upon the carrier to furnish cars is limited to those which the carrier may have on hand, or that there is no obligation to acquire facilities it does not possess, or to acquire better facilities to meet the reasonable demands of the shippers. I base my conclusion on the words of the act itself:

"It shall be the duty of every carrier subject to the provisions of this act to provide and furnish such transportation on reasonable request therefor."

No words more specific or definite than "provide and furnish" could have been chosen. I find no limitation of any kind in the act upon the duty thus imposed upon the carrier, except only that the request therefor be reasonable. There are no words from which it can fairly be assumed that existing ownership or control is a prerequisite to the carrier's duty to provide and furnish. From the explicit words

of the act, it would seem to follow that if a reasonable request is made for cars and the carrier does not possess them, it must acquire them for use, by one of the many methods for their acquisition. If not, this most important provision of the statute would be rendered largely nugatory. Perhaps the most effective blow which Congress could deal at discrimination in interstate traffic is the duty imposed on the carrier to furnish transportation. There could be no more prolific source of discriminatory practices than the right in the carrier to grant or withhold the means of transportation at its discretion. The demands of the favored shipper would be met by promptly acquiring and furnishing the transportation called for. "We do not have what you demand" would be a conclusive answer to the less favored. The flow of commerce is more vital, even, than that it be free from discrimination and preference. If the primary object of the act is to prevent discrimination, Congress evidently realized that the most effective method of prevention is to remove the opportunity for discrimination. We must assume that, if Congress had intended to set limitations on that duty, it would have done so in apt words, as it did with reference to other provisions of the act. For instance, the duty of the carrier to construct and operate switch connections with any lateral branch line of railroad, or private side track, is conditioned that such connection is reasonably practicable, and can be put in with safety, and will furnish sufficient business to justify the connection ·and maintenance of the same, and shall furnish cars for the movement of such traffic to the best of its ability. Again, the carrier's duty to furnish facilities for the interchange of traffic between their respective lines is qualified by the expression "according to their respective powers." It is highly significant, therefore, that the more important duty to furnish transportation has no limitation or condition, except upon the reasonable request of the shipper.

If the wisdom of the order in question, or its necessity, needed justification, it appears in the conclusive finding of the Commission that 91 per cent. of the refined oil of the country is shipped in tank cars at a great economic gain. I would therefore dismiss the petition of the complainant company.