## LANGDON v. PENNSYLVANIA R. CO.

(District Court, E. D. Pennsylvania. January 3, 1912.)

Nos. 280, 282, 450, 510, 514, 518, 526.

1. COURTS (§ 289*)—ACTIONS BY SHIPPER—JURISDICTION OF COURT—INTERSTATE COMMERCE ACT.

The matters which the Interstate Commerce Commission is given exclusive primary jurisdiction to hear and determine by section 15 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), as amended by Act June 29, 1906, c. 3591, § 4, 34 Stat. 590 (U. S. Comp. St. Supp. 1909, p. 1158), are those relating (1) to rates or charges claimed to be unjust or unreasonable, and (2) to regulations or practices of the carrier affecting such rates claimed to be unjust or unreasonable or unjustly discriminatory, or unduly preferential or prejudicial or otherwise in violation of the act, and are limited to general rates, regulations, and practices applicable to all shippers alike, and which the commission in the exercise of its administrative powers may correct by a general order, as well as award compensation in damages to the complainant. Such section as amended does not deprive a Circuit Court of jurisdiction of an action by a shipper under section 9 of the original act (Act Feb. 4, 1887, c. 104, 24 Stat. 382 [U. S. Comp. St. 1901, p. 3159]) to recover damages because of secret advantages given a favored competitor by a carrier in violation of its published rates.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 830; Dec. Dig.' § 289.*

Jurisdiction of federal courts of suits under interstate commerce act, see note to Bailey v. Mosher, 11 C. C. A. 318.]

2. CARRIERS (§ 32*)—INTERSTATE COMMERCE ACT—UNLAWFUL DISCRIMINATIONS.

Where a railroad company engaged in the interstate carriage of coal from the mines in its schedule of rates filed and published has grouped all points within a given territory together as a single initial point of shipment from which it makes the same rates, whether such points are on its own or connecting lines, the service rendered to all shippers from any of such points in the contemporaneous transportation of coal to the same terminal point, or to points within the same terminal group, is under substantially similar circumstances and conditions within the meaning of Interstate Commerce Act Feb. 4, 1887, c. 104, § 2, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3155), and a discrimination in favor of any such shipper over others is unlawful under said section.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*]

3. ABATEMENT AND REVIVAL (§ 52*)—CAUSES OF ACTION WHICH SURVIVE PENNSYLVANIA STATUTES—ACTION FOR VIOLATION OF INTERSTATE COMMERCE ACT.

An action under Interstate Commerce Act Feb. 4, 1887, c. 104, § 9, 24 Stat. 382 (U. S. Comp. St. 1901, p. 3159), against an interstate carrier to recover damages for a violation of the act, is not one strictly for the recovery of a penalty, and under Act Pa. Feb. 24, 1834 (P. L. 78) § 28, which provides that executors or administrators shall have power to commence and prosecute all personal actions which the decedent whom they represent might have commenced and prosecuted except actions for

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

slander. for libels, and for wrongs done to the person, such an action against a carrier which has abated by the death of the plaintiff may be revived in the name of his executors.

[Ed. Note.—For other cases, see Abatement and Revival, Cent. Dig. §§ 248–254; Dec. Dig. § 52.*]

4. CARRIERS (§ 32*)—INTERSTATE COMMERCE ACT—ACTION FOR DISCRIMINATION —DEFENSES.

The provision of section 15 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), as amended by Act June 29, 1906, c. 3591, § 4, 34 Stat. 590 (U. S. Comp. St. Supp. 1909, p. 1158), that, if the owner of property transported shall render services connected with the transportation or furnish any instrumentality used therein, a just and reasonable allowance may be made therefor, and giving the Interstate Commerce Commission power to determine and fix such allowance, applies only to allowances provided for by the schedules published by the carrier and applicable to all shippers similarly circumstanced, and such provision is not available as a defense to a carrier when sued for discrimination by making a secret allowance to a favored shipper.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*

What constitutes an unlawful preference or discrimination by a carrier under interstate commerce regulations, see note to Gamble-Robinson Co. v. Chicago & N. W. Ry. Co., 94 C. C. A. 230.]

At Law. Consolidated actions by John Langdon, by the Huntingdon Coal Company, by the Mt. Equity Coal Company, by Eichelberger & Co., by Warren H. and Chester D. Reed, by J. Herbert Sweet and William E. Shannon, as executors of the estate of William H. Sweet, deceased, and by the Carbon Coal & Coke Company against the Pennsylvania Railroad Company. On motions for judgments non obstante veredicto and for a new trial. Motions overruled.

See, also, 186 Fed. 237.

Harry Cessna, Graham & Gilfillan, and J. W. M. Newlin, for plaintiffs.

John Hampton Barnes, for defendant.

HOLLAND, District Judge. It appearing from the record that 11 cases which had been instituted in the Circuit Court against the Pennsylvania Railroad Company were of like nature, an order of consolidation was made August 16, 1909, and thereafter the causes thus consolidated were submitted to the jury, and in the seven above named a verdict was rendered in favor of the respective plaintiffs. In the first six cases the defendant moved for judgment non obstante veredicto, and filed no motions for a new trial. In the case of the Carbon Coal & Coke Company the defendant made a motion for judgment non obstante veredicto, and for a new trial. In the first five cases the reasons assigned for the motions are the refusal of the defendant's first point that the court has no jurisdiction, and the refusal of the defendant's second point. Under all the evidence the verdict of the jury should be for the defendant. In the case of the executors of Sweet an additional reason is assigned, viz., that there can be no recovery in an action by the executors substituted as plaintiffs. In the Carbon Coal & Coke Company Case the same reasons as in the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

first five cases are assigned upon the motion for judgment, and upon the motion for a new trial numerous reasons are assigned to the alleged errors in the charge of the court to the refusal of defendant's points, and because the damages are excessive.

The question of jurisdiction arises in all the cases, and a motion was made by the defendant during the trial to dismiss them all upon that ground, which motion was dismissed temporarily in an opinion reported in 186 Fed. 237, wherein the court then said:

"The court declines now to pass upon the question of jurisdiction, and reserves the determination thereof until after the trial of the cases upon the merits."

The cases having been tried and a verdict rendered for the plaintiffs, the question of jurisdiction must now be determined, and, as the court refused binding instructions in favor of the defendant in all the cases, under the Pennsylvania practice act of April 22, 1905 (P. L. 286), the defendant may move for judgment non obstante veredicto for any reason justified by the record.

On the question of jurisdiction, it is the contention of the defendant that under section 15 of the interstate commerce act, as amended by the act of June 29, 1906, the commission has exclusive primary jurisdiction to pass upon the grievances complained of by the plaintiffs, and that, until they have submitted the question to this tribunal, they are not authorized under section 9 of the same act to institute suits for damages in the Circuit Courts of the United States. The plaintiffs did not submit their grievances to the Interstate Commerce Commission, but instituted suit in the Circuit Court under section 9 for damages which they respectively claim to have suffered by reason of the acts of the defendant prohibited under sections 2 and 3.

The Pennsylvania Railroad is a common carrier engaged in interstate commerce. The plaintiffs are coal miners in the Clearfield region of Pennsylvania, and during the time of the alleged grievances were shipping coal over the Pennsylvania Railroad and its connecting lines from the Clearfield region to South Amboy on the New York Harbor, where the coal was lightered to New York, and there sold or transhipped, and they were also shipping over the defendant's line and connecting lines to points in the New England states. The defendant company had filed schedules of joint rates showing the charges for the transportation of coal from the Clearfield region to South Amboy and Harsimus Pier on the New York Harbor. These shipments will hereinafter be referred to as "New York Harbor shipments." The defendant company also filed schedules of joint tariff rates for the shipment of coal from the Clearfield region to numerous points of destination in the New England states. These will hereinafter be referred to as "all-line shipments." The injury which the plaintiffs claim they suffered results from the alleged discriminatory practice in favor of certain favored shippers in the shipment of coal from the Clearfield region to these various points of destination.

As to the "New York Harbor shipments," it appeared from the evidence that more than six years before these suits were instituted all the shippers of coal from the central part of Pennsylvania to New

York Harbor for sale to steamboat traffic and transhipment were required to use South Amboy as the point of destination. This point is about 20 miles south of the center of the harbor at New York, and the shippers of coal were required to lighter their coal from this point to the city. Some years ago it appeared that the Pennsylvania Railroad built a pier at Harsimus Cove, right in the center of the harbor, and 20 miles nearer the market than South Amboy. This pier was then leased, on a short term, to Berwind White Coal Company, which paid the cost of its erection at that time, and has had the exclusive use of this pier since its construction. Thereafter the plaintiffs were compelled in the shipment of their coal to New York Harbor to use South Amboy, and lighter it to the city for sale or transhipment, and the Berwind White Coal Company during all of this time has had the exclusive use of Harsimus Pier in the shipment of its coal from the Clearfield region to New York Harbor. The evidence showed that the Berwind White Coal Company received a certain allowance for taking the cars from the Pennsylvania siding into the pier, and unloading them, and returning the cars to the same point. This allowance amounted at times to from 7 to 15 cents per ton. It was also shown that the Berwind White Coal Company in selling their coal to transatlantic steamships could load directly from the pier, and the cost of lighterage across the harbor for transhipment was about 1 to 1½ cents a ton. The plaintiffs, who were excluded from Harsimus Pier and shipped to South Amboy, were compelled to lighter their coal by water a distance of 20 miles for sale or transhipment. There was evidence to show that the additional cost to the plaintiffs in shipping through South Amboy was as much as 18 cents a ton in excess of what it cost Berwind White Coal Company to ship through the Harsimus Pier, and, in addition, the latter company was paid 7 to 15 cents per ton for unloading cars, and had the advantage of location. At the trial the measure of damages claimed by the plaintiffs for shipments to New York Harbor through South Amboy was the amount they alleged they were required to pay in excess of what it cost Berwind White Coal Company, the favorite competitor, to reach the same point with its coal, taking into consideration the allowance to the latter.

And as to the "all-line shipments," it is claimed by the plaintiffs they were injured, in that the defendant company paid the Altoona Coal Company and the Glen White Company certain allowances for carrying the coal shipped by each over a small lateral railway which each of these companies owned at the initial point in the Clearfield region; that is to say, the Altoona Coal Company was the owner of a short lateral railway, about six miles in length, branching off at Kittanning, and leading through a mountain pass to the mines. This company received an allowance varying from 10 to 13 cents per ton on the coal they delivered to the defendant's main line at Kittanning over their lateral railway. The Glen White Company was the owner of a short lateral railway, two miles long, branching off at the same point. This company received from the defendant an allowance varying from 10 to 13 cents a ton for delivering its coal to the main line of the defendant company at Kittanning. There were two other coal

mining companies in the Clearfield region, to wit, the Mitchell Coal Company and the Pittsburgh, Johnstown, Ebensburg & Eastern Company, with a lateral road 30 miles long, neither of which companies received any allowance for transporting coal over their lateral road, and the jury was informed that the measure of the plaintiffs' damages for "all-line shipments" was the excess on payments the plaintiffs made for the transporting of their property as compared with what the Glen White and Altoona Companies were required to pay, taking into consideration the allowance made of from 10 to 13 cents to these companies. Evidence was offered to show these were secret allowances, and that the plaintiffs had no intimation of the payments being made.

[1] The contention of the defendant is that, notwithstanding the finding of the jury, these allowances made to the favorite shippers and the exclusive use of Harsimus Pier to the Berwind White Company are practices under section 15 of the commerce act, as amended by the act of 1906, which must primarily be investigated by the commission. Under this section, the commission has primary jurisdiction (1) where it is alleged that the rates or charges are unjust or unreasonable; (2) where it is alleged that any regulations or practices affecting such rates are unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial; (3) where it is claimed that any regulations or practices affecting rates are otherwise in violation of any provisions of the act. Under this section the commission is required to investigate (1) rates or charges; (2) regulations or practices, for the purpose of ascertaining how these existing rates or charges, regulations, or practices affect shippers when the matter is brought to its attention, as provided by section 13 of the act.

It is very evident from the language of this section that it was the intention of Congress that the commission should have exclusive primary jurisdiction to investigate regulations and practices of railroads which are known to be applicable to all shippers alike, such as rates and charges, which are required to be formulated into schedules and posted for the use of the general public, and all regulations and practices pertaining to the management of a railroad which are promulgated by the management as general orders and well-known regulations, such as the distribution of cars, time of detention, allowance for demurrage, icing of refrigerator cars, and all other matters of regulation and practice which can be said to be of a general character. And there is very good reason for requiring shippers who claim to be injured by these general regulations applicable to all to proceed before the commission. This tribunal has administrative powers and is authorized to pass upon the fairness of the regulation, and the question as to whether or not the regulation or practice works injuriously to some of the shippers and therein found to be discriminatory. It can, by general order, in accordance with the provisions of section 15, direct a modification of the regulation or practice by the railroad, and thereafter the entire shipping public to be affected by such regulation and practice will have equal and similar treatment.

The courts hold that it would be impossible for juries in the vari-

ous circuit courts of the country to work out any uniformity in a practice complained of if shippers be permitted to institute suits for alleged injuries resulting from general regulations and practices of railroads in the United States courts, and in order that the plain intention of Congress, as now appears in section 15, may be fully carried into effect, it is necessary to hold that section 9 is impliedly repealed, to the extent only, however, of preventing individuals from instituting actions in court to recover for alleged discriminatory practices resulting from rates and charges, regulations, or grievances which are of a general character, and the repeal is distinctly stated to extend no further, and the independent right of an individual originally to maintain an action in court to obtain pecuniary redress for violations of the act conferred by the ninth section must be confined to redress of such wrongs as can consistently, with the context of the act, be redressed by the courts without previous action by the commission. There will no doubt cases arise where it will be difficult to determine the tribunal in which the suit should be primarily instituted, but there should be no difficulty about arriving at the conclusion, in the cases at bar, that the proper tribunal or primary jurisdiction is the Circuit Court, because there was no scheduled rate or charge affecting rates alleged to be discriminatory and injurious, but the complaint of the plaintiffs is against a violation of the published schedules and rates.

It is alleged that the defendant company secretly, in violation of its published rate to New York and New England points, made certain allowances to its competitors, and in the "New York Harbor shipments" that one favored shipper was selected and a pier built for it 20 miles nearer the market, to which point it was permitted to ship its coal, and, at the same time, received an allowance of from 7 to 15 cents for an alleged service of unloading coal, whereas plaintiffs were compelled to go to South Amboy, 20 miles further south. It is very plain that these cases present a state of facts upon which alleged discriminations are based which are in no sense general regulations and practices in the conduct of a railroad, but they are in violation of the requirements of the whole spirit of the interstate commerce act in their manifest tendency to result in favoritism to some shippers to the detriment of others, and it is clear that it was this class of cases which it was intended by the Supreme Court should be instituted in the United States courts as the tribunals of primary jurisdiction for the redress of these wrongs, when it stated in Texas, etc., Railway Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, that section 9 of the act must be confined to the redress of such wrongs as can consistently, with the context of the act, be redressed by the courts without previous action by the commission.

There are three cases cited bearing upon the question. The first in point of time and the one of greatest importance is the Abilene Case, supra. In this case it was stated that section 9 of the interstate commerce act must suffer necessarily a partial implied repeal in order to preserve the integrity of the interstate commerce act; that is to say, where complaint is made against a schedule as filed with the Interstate

Commerce Commission on the ground that the rates were unreasonable or unjustly discriminatory as between localities, such action must go to the Interstate Commerce Commission first for correction. This conclusion was based upon the principle that, when the schedule was filed, it must stand until attacked, and you must have some place where you can begin with a standard schedule of rates, and, as these schedules are on file with the commission, the proper procedure is to go before the commission to correct them, on the theory that the whole schedule made up of various rates is so interdependent and interlocked that it would create the greatest confusion to allow juries in different sections of the country to be dealing with the same questions and possibly result in various and different decisions. But the court, in that case, was careful to state that the shippers' right to go into the Circuit Court was left undisturbed where it could be accomplished in general harmony with the interstate commerce act; but that the facts exhibited in the Abilene Oil Case (where the published schedule itself was to be corrected) were such that the conditions could not be corrected in harmony with the act, and it was necessary to impliedly repeal section 9 to the extent indicated in order to preserve the act. But we find nothing in that case which would prevent a shipper from going into the Circuit Court upon the facts in the cases at bar where his action is to compel the railroad to stick to the rates that it published, and thereby preserve the uniformity and equality of the rates that itself had published and filed, and, instead of tending to destroy the interstate commerce act, it would have the opposite tendency, to wit, compelling the railroads to strictly adhere to the published schedule of rates, and to treat their shippers along their road equally on all matters of rates and facilities.

The Baltimore & Ohio Railroad Company v. Pitcairn Coal Company, 215 U. S. 481, 30 Sup. Ct. 164, 54 L. Ed. 292, was a case which dealt with the rule of distribution of coal cars as made by the railroad. It was a general rule of the company applying to all shippers of coal, and the same reasons which impelled the court in the Abilene Oil Case to maintain the uniformity of the rule as to rates influenced the court in the Pitcairn Case in its conclusion that the tribunal of primary jurisdiction for the consideration of questions of that kind is the Interstate Commerce Commission. It is true that there were in the Pitcairn Case a number of arbitrary practices grafted on the general rule of distribution of cars, and the commission, upon taking jurisdiction of the case because of its general application to all shippers, of course, could pass upon and adjust the arbitrary practices in connection with the general rule of distribution of cars.

Morrisdale Coal Company v. Pennsylvania Railroad Co., 183 Fed. 929, 106 C. C. A. 269, was a case decided by the Circuit Court of Appeals of this circuit. In this case the company had formulated and issued a general regulation for the information of the shippers of coal, informing them of the method it had adopted for the distribution of its cars to the shippers for the shipment of their coal. It applied to everybody. The company had set out in its notice just what it would do in regard to the distribution of cars, and to this extent this rule

was analogous to the rule or regulation of rates published in their schedules and filed with the commission, and not at all similar to the secret departure from the rules of published rates in favor of two or three individuals, as it is claimed was the fact in these cases.

The complainants, both in the Pitcairn Case and the Morrisdale Case, were informed by the general regulations of the company what they could expect in the matter of distribution of cars, and they participated in these rules and regulations as to the distribution, but contended that the method of distribution worked an injustice to the respective claimants. The courts in both cases held that the tribunal of exclusive primary jurisdiction was the Interstate Commerce Commission in order that a uniformity of practice in regard to the distribution could be maintained, but the same reasons do not apply where there has been a secret allowance made to one or two shippers in a district, or where one particular shipper is picked out and given a special privilege, such as the exclusive use of Harsimus Pier.

The matter of a secret allowance to one or two favorite shippers is a violation of the public rates and schedules, and there is no reason why an injured shipper should apply to the Interstate Commerce Commission to pass upon the matter. It was not a general order applying to all shippers alike. Of course, it is conceivable that there might be a general regulation of a railroad company as to allowance for lateral railroads in proportion to their length, their cost of construction, or upon any other just and equitable basis, but in this case it was an arbitrary allowance of from 10 to 13 cents to one owner of a lateral road of 2 miles, and the same amount to the owner of another lateral road of 6 miles, and in the same territory there were other companies with lateral roads who received nothing, one with a trackage of about 30 miles, to which company an allowance had been refused.

From the facts as established in these cases, we conclude that the Circuit Court has primary jurisdiction of the subject-matter, and that they are clearly such wrongs as can consistently, with the context of the act, be redressed in courts without a previous action of the commission.

[2] It is contended, however, that, even if the court has jurisdiction of the cases, binding instructions should have been given to the jury to find a verdict for the defendant in all the cases. The principal ground for this, as stated by the defendant, is that all the shipments made by the plaintiffs in all the cases originated on the Huntingdon & Broad Top Railroad, an independent connecting line with the Pennsylvania Railroad, and all the shipments of the alleged competitors in whose favor the alleged allowances were made, were from the Clearfield region and were transported entirely over the line of the Pennsylvania Railroad, and hence the services rendered were not like services under substantially similar circumstances and conditions. It is true that all the shipments of the plaintiffs originated on the Huntingdon & Broad Top Railroad, an independent connecting line with the Pennsylvania Railroad at Huntingdon, Pa. The mines of the plaintiffs were located about 30 miles south of the Pennsylvania line on this independent railroad, and their coal was transported by it to Huntingdon,

where the shipments were taken up by the Pennsylvania railroad and carried to their destination.

The Pennsylvania Railroad, the defendant in this case, had filed a schedule of joint tariffs for the shipment of coal from Central Pennsylvania, and had included the Huntingdon & Broad Top Railroad in grouping the territory for shipments of coal, and the schedules show that the mines of the plaintiffs on the Huntingdon & Broad Top Railroad are scheduled as initial points with the alleged favorite shippers' mines, and both the plaintiffs' mines and the favorite shippers' mines are in the Clearfield zone. The tariff sheets filed in evidence show the same charges from these points to similar destinations, and the initial points are all placed together in the tariff as one initial point covering the Clearfield region. The defendant company made the rates, filed the schedule which placed the alleged favorite shipper and the plaintiffs in the same zone as an initial point, made the contract of carriage, and the plaintiffs, paid the rates to the defendant company. The plaintiffs had nothing to do with the Huntingdon & Broad Top Railroad so far as the contract of carriage or the payment of the freight rate was concerned. The fact that the defendant company grouped this territory as initial points and scheduled these shippers together as such in their joint tariffs was submitted to the jury with the other evidence upon the question of whether or not this was a service in transportation under substantially similar circumstances and conditions, and the verdict establishes that the jury found in the affirmative, and it is quite evident that the conclusion reached by the jury would be justified by this evidence alone.

As to the destination points on the "all-line shipments," the same facts appeared in the joint tariff filed by the defendant company. It had made certain groups of territory and had bracketed the towns together in their schedule of rates, showing that they regarded them as similar destination points.

As to "New York Harbor," the evidence was to the effect that the whole harbor was the destination point for the supply of steamboats and for transhipment beyond. The finding of the jury establishes that this defendant received a greater compensation from the plaintiffs than it did from the alleged favorite shippers for doing for them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions. As the verdict was based on ample evidence to justify it, the court is not warranted in entering judgment for the defendant.

[3] The reasons assigned for refusing to enter judgment in favor of the defendant notwithstanding the verdict in the Carbon Coal & Coke Company apply to the other six cases, but there is still one reason assigned for judgment non obstante veredicto in the Sweet Case, to wit: "There can be no recovery in the action by the executors substituted as plaintiffs." The record shows that the plaintiff, William H. Sweet, died since the action was begun, and that the fact of his death has been noted on the record, and the executors substituted as plaintiffs. It is contended by the defendant that this action being in the nature of a penalty, although not treble damages, is not assignable, and therefore does not pass to the executors.

Section 28 of the Pennsylvania act of February 24, 1834 (P. L. 78), provides:

"That executors or administrators shall have power to commence and prosecute all personal actions which the decedent whom they represent might have commenced and prosecuted, except actions for slander, for libels, and for wrongs done to the person."

In Penrod v. Morrison, 2 Pen. & W. (Pa.) 126, it was decided that an action on the case for conspiracy to defraud a creditor survives to the personal representatives of the plaintiff.

The contention of the defendant that suit for damages for discrimination cannot be assigned is undoubtedly supported by the case of Sensenig v. Pennsylvania Railroad Co., 229 Pa. 168, 78 Atl. 91, but the same court has held, in effect, that there is no necessary connection between what can be assigned and what survives. McCafferty v. Railroad Co., 193 Pa. 339, 44 Atl. 435, 74 Am. St. Rep. 690.

The Supreme Court of the United States has said that statutes giving a private action against a wrongdoer are sometimes spoken of as penal in their nature, but in such cases it has been pointed out that neither the liability imposed nor the remedy given is strictly penal. Huntingdon v. Attrill, 146 U. S. 657, 13 Sup. Ct. 224, 36 L. Ed. 1123. The right sought to be enforced by Sweet's executors may be in the nature of a penalty, but it is not strictly a penalty. Huntingdon v. Attrill, supra; Brady v. Daly, 175 U. S. 148, 20 Sup. Ct. 62, 44 L. Ed. 109; City of Atlanta v. Chattanooga F. & P. et al., 127 Fed. 23, 61 C. C. A. 387, 64 L. R. A. 721. As the federal courts hold the liability under the act is not strictly a penalty, it is a cause of action which survives, and the executors are authorized to prosecute the action. Judgment in favor of the defendant, for this reason, in the Sweet Case, is refused.

[4] There are a number of reasons for a new trial in the Carbon Coal & Coke Company, but we do not think it necessary to consider any of them, excepting the nineteenth, which is an assignment of error to a portion of the charge of the court, as follows:

"There is a provision of this act, gentlemen of the jury—paragraph 3 of section 15 of the act of 1906—which says: 'If the owner of property transported under this act directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance thereof shall be no more than is just and reasonable, and the commission may, after hearing on a complaint determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the services so rendered, or for the use of the instrumentality so furnished, and fix the same by appropriate order, which order shall have the same force and effect and be enforced in like manner as the orders above provided in this section.' You will see that there is a provision that if the owner of property renders any services, either directly or indirectly, there may be a compensation for it, and that the commission shall upon complaint and hearing pass upon the reasonableness of it, but that is to be construed in connection with the other sections of the act, and that is that the defendant carrier is required to publish its rates and charges, and it can put upon its schedule a rate or a charge for the payment of services by any of its shippers along its line, and pay to that shipper legally, after it has put upon its schedule for any service it has done. That was enacted in 1906, and since 1906 all carriers in their schedules have had a right to give reasonable compensation for any services which a shipper renders in the transportation of its property. Then, if there is any complaint by other shippers upon the

amount which the carrier has scheduled and is paying to the shipper for such services, the act says that the commission shall adjust it and shall say what is a reasonable charge, and thereafter by an order the carrier shall be required to make only such charge. The section has no application to a situation of this kind."

We are still of the opinion that the section is not applicable to the facts in this case. The defendant made a secret allowance which was not known to the plaintiffs, and, when discovered and suit instituted to recover the damages resulting therefrom, the defendant set up that it was for services, with the exception of the Berwind White Company payments, for which they gave no reason. This section must be considered in connection with the other provisions of the act, and not in such a way as to enable railroad companies to give rebates, and subsequently claim they are for services rendered, however secret and unreasonable the allowances or rebates may appear.

It is plain that the services rendered by an owner referred to in section 15 are services which it has scheduled in its tariff rates and published in accordance with section 6 of the interstate commerce act and applicable to all shippers similarly circumstanced, and, when so published, if a shipper objects to the payment of the amount set forth in the published tariff, he will be required to establish its injurious and discriminatory effect upon him by applying to the commission to have it corrected. It does not follow that the amount so scheduled would be regarded as a lawful and reasonable payment. The commission might regard it as excessive, but shippers who did not receive it or who did not receive as fair treatment as others would have notice of its existence, and could defend against any discriminatory effect in its payment. But, where there is no publication made of the allowance, the section does not apply. It is not contended that the placing of such an allowance on the published tariffs would determine the legality or illegality of the payment. It would simply determine the tribunal to which an injured party would be compelled to apply to redress his wrongs, to wit, to the Interstate Commerce Commission; but where, as in this case, there was a secret allowance to some shippers not mentioned or published in the schedule, there would be no notice to other shippers. They could not know what allowances were being made, and there would be no regulation or practice to correct, so far as the general rules of the company or the published rates informed the shipper. The view of the defendant as to this paragraph of section 15 would enable the railroad company to rebate and discriminate in this way to an extent limited only by its ability to avoid discovery.

All the reasons for a new trial are overruled, and a new trial refused.