## CORONA COAL CO. v. SOUTHERN RY. CO.

(District Court, N. D. Alabama, S. D.  July 15, 1920.)

1. **Carriers** ⊕⩵34—**Suit relating to distribution of coal cars not within jurisdiction of court.**

   A suit to enjoin a practice of a railroad company, in time of a shortage of coal cars, to deliver assigned cars, whether its own or those of other railroads or private owners, to mines with which the owners had contracts for coal, counting them against the quota of such mines under their respective ratings, under Interstate Commerce Act, § 1, par. 12, as amended by Transportation Act Feb. 28, 1920, and distributing commercial cars only to fill such quotas, *held* to present an administrative question for determination by the Interstate Commerce Commission, and not within the jurisdiction of the District Court.

2. **Appeal and error** ⊕⩵458(3)—**Continuance of dissolved injunction pending appeal denied in court's discretion.**

   Where a preliminary injunction, granted by a state court ex parte, without notice, is dissolved by a federal court after removal of the cause and a hearing, on the ground that neither court has jurisdiction of the subject-matter, the court will not, in the exercise of its discretion, allow a supersedeas to continue the injunction in force pending an appeal.

In Equity.  Suit by the Corona Coal Company against the Southern Railway Company.  On motion to dismiss bill and motion for supersedeas.  Motion to dismiss granted, and motion for supersedeas denied.

Johnston & Cocke, of Birmingham, Ala., and Rush C. Butler, of Chicago, Ill., for plaintiff.

S. R. Prince, of Mobile, Ala., and J. T. Stokely, of Birmingham, Ala., for defendant.

---

CLAYTON, District Judge. The plaintiff, a Delaware corporation engaged in the business of mining coal, filed its bill in the circuit court of Jefferson county, Ala., against the defendant railway, a Virginia corporation. A state judge granted an interlocutory injunction as prayed for in the bill. The case was removed to this court, and is now submitted on the defendant's motion to dissolve the injunction and on the pleadings, the bill and the answer, each verified, and affidavits in support of and in opposition to the motion.

[1] The basis of the plaintiff's complaint is that the defendant, in the distribution of coal cars to mines located on its railroad in the Birmingham mining district, is violating, to the injury of the plaintiff, the provisions of paragraph 12 of section 1 of the Interstate Commerce Act, as amended by the Transportation Act of February 28, 1920, which paragraph is in these words:

"(12) It shall also be the duty of every carrier by railroad to make just and reasonable distribution of cars for transportation of coal among the coal mines served by it, whether located upon its line or lines or customarily dependent upon it for car supply. During any period when the supply of cars available for such service does not equal the requirements of such mines it shall be the duty of the carrier to maintain and apply just and reasonable ratings of such mines and to count each and every car furnished to or used by any such mine for transportation of coal against the mine. Failure or refusal so to do shall be unlawful, and in respect of each car not so counted shall be deemed a separate offense, and the carrier, receiver, or operating trustee so failing or refusing shall forfeit to the United States the sum of $100 for each offense, which may be recovered in a civil action brought by the United States."

The pleadings, affidavits, and arguments show that the real issue between the parties is on account of the practice pursued by the defendant in respect to "assigned cars"; that is to say, the defendant delivers its own cars to mines with which it has contracts for fuel for its own use, and delivers the cars belonging to other railroads and privately owned cars committed to it for transportation to mines with which said other railroads and owners have contracts for fuel. It is established—indeed, it is not controverted—that such cars are counted against the distributive share of the mines to which assigned, and that such mines are not given a share of the cars available for ordinary commercial shipments, unless, and to the extent only, that the assigned cars fail to equal the distributive share of these mines, which receive the assigned cars. The defendant contends that it has the right to deliver its own cars in any number which may be necessary to obtain fuel to operate its trains, and that the other railroads and private owners have the right to require that the defendant deliver their cars to the mines with which they have contracts for coal—that the possession of such cars was committed to it in each case for that specific purpose. It is further urged by the defendant that during the period of a car shortage the practice complained of by the plaintiff is necessary, in order to enable the defendant and the other railroad companies to comply with their contracts for fuel supply, and that, if a different course be pursued during the periods of car short-

age, the defendant and the other railroads would violate their contracts, and be compelled to go into the open market for the fuel necessary for the operation of their railroads, and compete in the purchase of coal with industrial enterprises and domestic concerns, and would probably have to pay whatever price the coal operators might demand at the time, or else the defendant and such other railroads would be forced to confiscate coal for the operation of their trains. It is conceded that confiscation is a vicious practice, and not justifiable, except in case of extreme necessity.

The defendant urges that the practice complained of is not only in the exercise of a right, but is in pursuance of the duty it owes to the traveling and shipping public to operate its trains, and that, if such other railroads and owners of cars committed to defendant for the specific purpose stated could not have the use of their cars, they would cease to deliver them to the defendant, and that in the case of the said other railroads and owners of private cars the defendant owed the duty to carry out the purpose for which the cars were committed to it, and, further, that the defendant has the common-law right to pursue such practice, and has the authority of the Interstate Commerce Commission, clothed with power in such matters, to do this, which authority is in the form of the notice of April 15, 1920, as follows:

"Interstate Commerce Commission.

"Washington, April 12, 1920.

"Notice to Carriers and Shippers.—The supply of cars available for the transportation of coal continues insufficient to meet the demand. In view of the cessation of government control of coal productions and distribution, effective April 1, 1920, and in order that railroad fuel requirements may be reasonably met without the necessity of carriers resorting to confiscation of commercial coal, it becomes necessary to amend our notice to carriers and shippers dated March 2, 1920, and our recommendation therein, to read as follows:

"The Commission recommends that, until experience and careful study demonstrate that other rules will be more effective and beneficial, the uniform rules as contained in the Railroad Administration's Car Service Section Circular CS 31 (Revised) be continued in effect, except that rule 8, as contained in said circular, should be amended to read:

" '8. Private cars and cars placed for railroad fuel loading in accordance with the decision of the Interstate Commerce Commission in R. R. Com. of Ohio et al. v. H. V. Ry. Co., 12 I. C. C., 398, and Traer v. Chicago & Alton Railroad Co. et al., 13 I. C. C. 451, will be designated as "assigned" cars. All other cars will be designated as "unassigned" cars.'

"The Commission is of the opinion that an emergency exists requiring immediate action, and in exercise of the authority conferred by paragraph 15 of section 1 of the Interstate Commerce Act, as amended by section 402 of the Transportation Act, 1920, hereby suspends the operation of the existing rule 8, and directs the observance by all carriers by railroad subject to the Interstate Commerce Act of rule 8, modified as above, effective April 16, 1920, and until further direction or order of the Commission.

"By the Commission:                          George B. McGinty, Secretary."

The answer and motion to dissolve the injunction raises the question of whether or not the coal company has appealed to the proper tribunal for redress of the alleged grievance. The railroad insists that

the coal mining company should have first gone with its complaint to the Interstate Commerce Commission, which, it is contended, has primary jurisdiction over the controversy between the plaintiff and defendant. The decision of the question turns upon the effect to be given to paragraph 12, § 1, of the Interstate Commerce Act, as amended by section 402 of the Transportation Act of 1920, hereinbefore set out.

In considering the effect and scope of this paragraph, the high and comprehensive administrative powers and duties of the Interstate Commerce Commission must not be forgotten; and it is well to remember that the acts of Congress furnish repeated evidence of a legislative policy to broaden and add to, rather than to narrow and subtract from, the powers and useful work of the commission. Again it is to be borne in mind that the Supreme Court of the United States has often, in interpreting the Interstate Commerce Act (24 Stat. 379) and the amendments thereto, given judicial recognition of this legislative policy.

I think the paragraph 12 quoted should be considered and construed in the light of this knowledge, as well as in pari materia with the other related sections of the Interstate Commerce Law. Let it be observed that before the passage of the act of 1920 it was often held by the commission and the courts that the carrier should observe just and reasonable rules, regulations, and practices with respect to car service, and as a corollary, unjust and unreasonable practices were condemned as unlawful; and the reported cases furnish abundant evidence that the commission has repeatedly, in cases somewhat, at least, resembling this, given redress where just complaints sustained by the evidence have been made.

In the argument of this case, it was admitted by the plaintiff that it had been given by the defendant its proper rating as one of the coal mines on the defendant's railroad. It was also conceded by both parties during the argument that neither the plaintiff nor any other coal-mining company in the same district and on the same railroad had in any case, during the present car shortage, received a full quota of cars according to the rating of the mine; and it was shown that the defendant did not have a sufficient number of cars to meet the demand of its coal mining patrons.

Prior to the amendment of the Interstate Commerce Law by the insertion in paragraph 12 of the words "and to count each and every car furnished to or used by any such mine for transportation of coal against the mine," this rule, now statutory, had been by order of the Interstate Commerce Commission a rule of long standing for the government of railroads, and it had been often sanctioned by the courts in adjudicated cases. So it can be said that this approved rule, in effect already law, was by the Transportation Act of 1920 merely crystallized into statutory form. Can it be urged that the fact it is now imbedded in the Transportation Act gives it any more far-reaching or controlling influence over the commission than it had as a sanctioned rule? Does it subtract from the powers and duties of

the Interstate Commerce Commission to see to it in every case that the transportation companies, in the matter of car service, follow just and reasonable practices? The Interstate Commerce Commission promulgated the rule as to assigned cars, the courts sanctioned it, and Congress has approved it. Now, must this rule, recognized by the courts as having the force and effect of law, simply because it is at this time a part of the statute, control the question here, as the plaintiff insists, or must it be allowed to operate in harmony with the other provisions of the Interstate Commerce Law, as it has heretofore, and to the end that the commission shall have the power to compel the transportation companies to conduct business in a fair, just, and reasonable way, in view of all the circumstances arising in the case of car shortage?

Let it be remembered that it was said in Penn. R. R. Co. v. Puritan Coal Co., 237 U. S. 121, 35 Sup. Ct. 484 (59 L. Ed. 867):

"That * * * it must be borne in mind that there are two forms of discrimination—one in the rule, and the other in the manner of its enforcement; one in promulgating a discriminatory rule, the other in the unfair enforcement of a reasonable rule. In a suit where the rule or practice itself is attacked as unfair or discriminatory, a question is raised which calls for the exercise of the judgment and discretion of the administrative power, which have been vested by Congress in the commission. It is for that body to say whether such a rule unjustly discriminates against one class of shippers in favor of another. Until that body has declared the practice to be discriminatory and unjust, no court has jurisdiction of a suit against an interstate carrier for damages occasioned by its enforcement. When the commission has declared the rule to be unjust, redress must be sought before the commission or in the United States courts of competent jurisdiction, as provided in section 9. But if the carrier's rule, fair on its face, has been unequally applied, and the suit is for damages, occasioned by its violation or discriminatory enforcement, there is no administrative question involved; the courts being called on to decide a mere question of fact as to whether the carrier has violated the rule to plaintiff's damage."

This case draws the line of demarcation between that class of complaints which may be heard by the courts and the other class that must be dealt with by the commission. If the practice itself is attacked as unfair and discriminatory, the exercise of the judgment and discretion of the commission is called for; but until that body had declared the practice to be discriminatory and unjust no court has jurisdiction of an interstate carrier (defendant here is such) for damages (this bill seeks damages as well as injunction) occasioned by the operation of such practice.

I think it is clear in the instant case that the bill attacks the practice itself, and not the unequal application by the defendant of such practice. Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075; Baltimore & Ohio R. Co. v. Pitcairn Coal Co., 215 U. S. 481, 30 Sup. Ct. 164, 54 L. Ed. 292; Morrisdale Coal Co. v. Penn. R. R. Co., 230 U. S. 304, 33 Sup. Ct. 938, 57 L. Ed. 1494; Loomis v. Lehigh Valley R. R. Co., 240 U. S. 43, 36 Sup. Ct. 228, 60 L. Ed. 517. And, if so, this court is without jurisdiction at this time to grant relief to the plain-

tiff. This must be true, unless paragraph 12, quoted, takes the case from under the influence of the decision in adjudicated cases, and out of the primary jurisdiction of the Interstate Commerce Commission during a period of car shortage, such as is shown to exist at this time. It is to be noted that this paragraph 12 provides that—

"During any period when the supply of cars available for such service does not equal the requirements of such mines it shall be the duty of the carrier to maintain and apply just and reasonable ratings of such mines and to count each and every car furnished and used by any such mine for transporation of coal against the mine."

Also that paragraph 6 of section 400 of the Transportation Act of 1920 makes it the duty of common carriers to establish, observe, and enforce reasonable and just classification of property for transportation and all other matters relating to or connected with the receiving and transporting of the same, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful. Paragraph 10 defines car service to include the use, control, distribution, exchange, return of locomotive, cars, etc.; further, paragraph 11 makes it the duty of the carrier to furnish safe and adequate car service, and to establish, observe, and enforce just and reasonable rules and regulations with respect to car service. Paragraph 13 authorizes the commission to require all carriers to file with it rules and regulations with respect to car service, etc. Paragraph 14 empowers the commission, "on a complaint or upon its own initiative," to establish reasonable rules, regulations, and practices with respect to car service by carrier, including the compensation to be paid for the use of any locomotive, car or other vehicle not owned by the carrier using it, etc. And paragraph 15 authorizes the commission, in case of shortage of equipment, congestion of traffic, or other emergency, upon complaint or upon its own initiative, to suspend the operation of any or all rules, regulations, or practices with respect to car service for such time as may be determined by the commission, to make just and reasonable direction with respect to car service, without regard to the ownership, during such emergency, which will best promote the service in the interest of the public, and upon such terms of compensation as between carriers as they may agree upon, or as the commission finds to be just and reasonable, and to give directions for preference or priority in transportation, embargoes, or movement of traffic under permits, and to modify, change, suspend, or annul them. Paragraph 17 provides that the direction of the commission as to car service and to the matters referred to in paragraphs 15 and 16 may be made through and by such agents or agencies as the commission may designate and appoint for that purpose.

An examination of the Transportation Act shows that Congress has not declared, in paragraph 12 or elsewhere, that in a case like the one now here the pro rata plan of distribution shall be applied to assigned cars according to mine rating as in the case of ordinary commercial cars; but the statute says no more than such "as-

signed cars shall be counted against the mine receiving them." What shall be done in a case like the one before me, where most of the available cars are assigned cars, Congress has not declared, but has left it, I think, as a matter to be examined into, heard, adjusted, and settled, or at least passed upon, by the Interstate Commerce Commission. The effect of the plaintiff's contention is that during the period of inadequate car supply the carrier must maintain and apply reasonable ratings of the mines which it serves, and distribute all available cars in proportion of such ratings, whether such cars, or any or all of them, be assigned cars.

The origin and history of the phrase "apply just and reasonable ratings of such mines and to count each and every car furnished to or used by any such mines for transportation of coal against the mines," shows the reason for its adoption by the commission and its incorporation afterwards into the statute. Congress knew that at one time assigned cars were not taken into account in the distribution by the carriers to mines served by them, and that the mines receiving assigned cars were given the same pro rata share of the ordinary commercial cars as were given to the mines that received no assigned cars, and that the assigned cars were not counted against the mines favored with them. In the Hocking Valley Case, 12 Interst. Com. R. 398, and in the Traer Case, 13 Interst. Com. R. 451, this practice was complained of and held to be unjust and not to be allowed. When the question came before the Supreme Court of the United States, the decision was upheld in I. C. v. Ill. C. R. R. Co., 215 U. S. 452, 30 Sup. Ct. 155, 54 L. Ed. 280. It is well to read the opinion in the Traer Case, rendered by Commissioner Clark, now Chairman of the Interstate Commerce Commission. It may be ventured that Congress did not intend to change the meaning of the phrase "count against the mine," or to enlarge the scope of the rule which is referred to in the Ill. C. R. R. Co. Case, supra, and the Morrisdale Coal Co. Case, supra.

In the argument of this case the statement of Commissioner Clark made before the House committee on interstate and foreign commerce, when it had under consideration the Esch-Cummins Bill, which put into statutory law the rule found in paragraph 12 hereinbefore referred to, was read to me, and at the same time the pertinent part of the report of the House committee was stated. Undoubtedly this report shows that the House committee understood what the language, "and to count each and every car furnished to or used by such mines for transportation of coal against the mine," meant and gave legislative sanction, so far as it could, to the application of this rule theretofore adopted by the commission and approved by the courts; and from the hearings of the committee and its report it is evident that it was not intended to say assigned cars should in any event be prorated among the mines.

It must be said that the opinions of the Interstate Commerce Commission in giving the working construction of the Interstate Commerce Act and its amendments, while not binding upon the court, is

nevertheless deserving of serious and deferential consideration. The fact that the commission made the ruling of April 15, 1920, which is hereinbefore set out, shows it did not consider that paragraph 12 ousted the commission of its jurisdiction, in the matter of coal car distribution during the periods of car shortage, or, in other words, that the commission was deprived of its administrative power in making distribution of cars in the case of car shortage. As I have said, the statute does not declare that assigned cars shall be prorated. Certainly it does not say that they shall stand idle on the side tracks of the railroad until the ordinary commercial cars received by mines which have no assigned cars shall equal the number of assigned cars received by and counted against the mines furnished with assigned cars. Moreover, there is forceful evidence of the commission's construction of paragraph 12, found in the words of the chairman of the commission; for in the inception of this controversy, and before this bill was brought, this plaintiff here applied to the chairman of the commission and received an informal hearing of the very matter involved in this case. At that time the following statement was made by the chairman (Mr. Clark):

"The Chairman: Let me say, in order that there may be no misunderstanding of our view, that some reference has been made to the Transportation Act requiring that the railroads shall count against the mines assigned cars, which left me with the impression that it was believed that that act, properly construed, means that a railroad may not use assigned cars, if such use results in giving a mine more than its pro rata distribution. Now, we do not accept that interpretation of it at all. We are very certain that it does not mean that at all. It means just what this commission laid down as the rule in the Traer Case. That is the intention of the act, and this is the interpretation we place upon it."

On consideration of paragraph 12 and the other provisions of the Transportation Act, and the purpose for which the Interstate Commerce Commission was created and clothed with authority, I am constrained to believe that the plaintiff has presented a case for administrative intervention, and not one calling for the exercise of a judicial function. At the expense of repetition, I must say that paragraph 12 does not call for a pro rata division of assigned cars, nor does it say what shall be done with them, except that they shall be counted against the mines to which they are assigned. If the plaintiff's interpretation of paragraph 12 should be followed, it would be to read into the statute a provision which it does not contain, and which it seems clear that Congress failed or refused to write there or elsewhere as a part of the act. It would have been a very easy matter, if Congress had adopted the plaintiff's view, to have added to paragraph 12 words of this purport:

"There shall be distributed to the mines their proportionate number of cars according to mine ratings, whether or not the cars or any of them be assigned cars."

Congress did not adopt such idea, and for the courts to adopt it would be to add to the statute, and would, in effect, also greatly tend

to destroy the power and usefulness of the Interstate Commerce Commission in time of distress and car shortage, and cause confusion in the distribution of cars in the mining districts. This condition would probably extend as a consequence to other industries. Moreover, for the courts to assume jurisdiction over cases like the one presented by the plaintiff would be a suggestion that the courts be invited to interfere in all similar controversies between mines and railroads. This would force the courts to go very largely into the business of railroad and mine administration, and thereby, to the extent of such interference, would be imposed insuperable work of mere direction and management and not of a judicial character. The courts are not fitted for such duties, but the Interstate Commerce Commission is especially and well designed for that field of usefulness.

It was also suggested in the argument, in a parenthetic way, but not insisted upon, that the bill is without equity, because the plaintiff has a plain and adequate remedy at law. For whatever injury the plaintiff might sustain by the alleged conduct of the defendant, it might be that damages could be recovered in an action at law; and probably it would be no answer to say that the facts presented here operate to place the plaintiff's cause among that class of rare cases where a court of equity may assume jurisdiction of a controversy in order to prevent a multiplicity of suits. See the authorities referred to in M. L. & W. Power Co. v. Charles (D. C.) 258 Fed. loc. cit. 726, 727. In the view I have taken of this case, it is not necessary for that question to be decided.

I have concluded that the real purpose of paragraph 12 was to carry into the statute what had been a requirement of the Interstate Commerce Commission; that is, that each car must be counted against the mine to which assigned, in determining whether the assigned cars equal or exceed the distributive share of such mine; and I believe that all other pertinent questions arising in such a case as this pending one were left to the discretion and judgment of the Commission.

The plaintiff's grievance should have been taken to the Interstate Commerce Commission, and therefore this court is without jurisdiction. The motion to dissolve the injunction issued out of the circuit court of Jefferson county, Ala., is granted, and the appropriate order will be entered.

### Supplemental Opinion.

On the defendant's motion to dissolve the interlocutory injunction heretofore issued out of the state court, this court has heretofore rendered an opinion holding that it is without jurisdiction of the subject-matter involved in the bill, and announced that the motion to dissolve the interlocutory injunction would be granted, and requested the attorneys to agree on the form of the order. Thereupon the attorney for the plaintiff suggested a final decree dismissing the bill for want of jurisdiction, in order that the case may be taken directly to the Supreme Court of the United States under section 238 of the

Judicial Code (Comp. St. § 1215). The defendant's attorney expressed a willingness to co-operate to this end, and has accordingly on this day filed a motion to dismiss the bill under equity rule 29. There can be no objection to the suggested course.

[2] The cause is now before the court on the plaintiff's application to supersede the decree dissolving the injunction and to restore the injunction during the pendency of its appeal to the Supreme Court. A reading of the equity rules, the pertinent sections of the Judicial Code, and the decisions of the federal courts make it clear that the granting of such motion to continue the injunction in force pending an appeal rests in the sound discretion of the court. Equity rule 74, 198 Fed. xxxix, 115 C. C. A. xxxix; Judicial Code, § 129 (Comp. St. § 1121); In re Manufacturing Co., 147 U. S. 525, 13 Sup. Ct. 527, 37 L. Ed. 266; Masses Publishing Co. v. Patten, 245 Fed. 102, 157 C. C. A. 398; Chemical Co. v. Chalmers, 242 Fed. 71, 155 C. C. A. 15.

The court has heard and carefully considered the argument of the attorneys for the parties and the considerations urged in support of and in opposition to the application. In the view which I have taken of the case, as announced in the opinion rendered herein on yesterday, I am forced to the conclusion that, if the bill had originally been filed in this court, and application made for interlocutory injunction, the injunction, after notice and hearing as provided in equity rule 73, 198 Fed. xxxix, 115 C. C. A. xxxix, would have been denied. In those circumstances the plaintiff could not, of course, have had the benefit of an injunction pending an appeal. The fact—the mere fact—that the interlocutory injunction was inadvertently granted (it was granted on ex parte showing without notice to defendant) by the state court on the filing of the bill, before the case was removed to this court, should not, it seems to me, alter the substantial rights of the parties. A federal judge could not have granted the injunction in this case, upon an ex parte showing without notice to the defendant, without disregarding the statutes and rule which govern in such case.

The court is mindful of the fact that the continuation of the injunction pending the suggested appeal would be calculated to encourage other mine operators in a situation similar to that occupied by the plaintiff, to seek redress in the state court as that sought there by the plaintiff. Such a course would tend to render nugatory the rules of car distribution established by the defendant under the sanction of the Interstate Commerce Commission and in conflict with the action of this court. I have held that the court, any court, has no jurisdiction of the controversy presented by the bill. Having taken such view of the case, this court could not, in the exercise of sound judicial discretion, consistently keep in force the interlocutory injunction. In my view, such a course would be illogical, and would be but another way of allowing the plaintiff injunctive relief, which I have denied.

That the shortage of cars adversely affects the coal-mining company is fully understood, and that the interests of the plaintiff may

to a greater or less extent be injured by the refusal of the court to keep in force the injunction, is appreciated. But the answer to this suggestion is that, under the view of the case which the court has taken, the plaintiff can apply for, and doubtless receive, immediate redress from the Interstate Commerce Commission, which, as the court has held, has jurisdiction of the subject-matter of the plaintiff's complaint, and is designed and equipped to grant relief upon proper showing being made.

Order will be entered denying the motion to supersede the decree dissolving the injunction.